THE STATE OF OHIO, APPELLANT, *v.* WILCOX, APPELLEE.

(No. 81-977—Decided June 16, 1982.)

*Mr. John T. Corrigan,* prosecuting attorney, and *Mr. Donald C. Nugent,* for appellant.

*Mr. Floyd B. Oliver* and *Mr. James A. Carney,* for appellee.

SWEENEY, J.  The question before the court in the instant appeal is whether appellee is entitled to a new trial at which he may present expert psychiatric testimony relating to his alleged incapacity to form the requisite specific intent to commit aggravated murder and aggravated burglary. The state, finding support in the dissent below, contends that "all relevant admissible evidence related to the mental status of Moses Wilcox was before the jury." As a consequence thereof,

the state further contends that "any additional psychiatric testimony if offered would not have altered anything in the trial" and therefore the trial court's refusal to admit the additional evidence even if erroneous constituted non-prejudicial, harmless error.[1] Appellee argues that the Court of Appeals did not err in ordering a new trial because the "defense of diminished capacity is properly proveable [sic] in the state of Ohio and that where the trial court frustrates or otherwise fails to admit relevant testimony in furtherance of its proof, as in the instant case, it has committed reversible error."

The parties herein and the court below, relied on *State* v. *Nichols* (1965), 3 Ohio App. 2d 183, as authority for the proposition that the partial defense of diminished capacity is recognized in Ohio. The case of *State* v. *Jackson* (1972), 32 Ohio St. 2d 203, certiorari denied (1973), 411 U. S. 909, has gone unnoticed, or at the very least uncited, at any stage of these proceedings. In *Jackson* the question of whether Ohio would recognize the diminished capacity defense was briefed, argued, and explicitly, albeit cursorily, rejected by this court.[2] *Id.* at page 206. We adhere to the rule adopted in *Jackson* but shall endeavor in this opinion to spell out our objections to the diminished capacity defense and thereby overcome whatever confusion our nearly invisible treatment of diminished capacity in *Jackson* has engendered among bench and bar.

## I.

At the outset we note that there are a number of variations on the diminished capacity theme and a variety of labels have been applied to the doctrine.[3] Inasmuch as the Court of

---

[1] The state also raises an issue relating to Crim. R. 16, which we need not reach.

[2] *Jackson sub silentio* limited *Pigman* v. *State* (1846), 14 Ohio 555, to its facts and rejected *Pigman dicta* that arguably would support the admission of evidence of diminished capacity.

[3] The various names include *inter alia* diminished or partial responsibility, partial insanity, and the *Wells-Gorshen* rule (after *People* v. *Wells* [1949], 33 Cal. 2d 330, 202 P. 2d 53, certiorari denied 338 U. S. 836, and *People* v. *Gorshen* [1959], 51 Cal. 2d 716, 336 P. 2d 492). Commentators have fashioned a functionally related nomenclature that seeks to differentiate the ways in which the doctrine has been applied. See, *e.g.,* Arenella, The Diminished Capacity and Diminished Responsibility Defenses: Two Children of a Doomed Marriage, 77 Colum. L. Rev. 827 (hereinafter "Arenella") (distinguishing the *"mens rea* model," "diminished capacity," and "diminished respon-

Appeals below referred to *United States* v. *Brawner* (C. A. D. C. 1972), 471 F. 2d 969, for the doctrinal underpinning of its diminished capacity formulation, it is appropriate for us to use the *Brawner* model of diminished capacity to provide a working definition of the doctrine for purposes of our discussion herein. According to *Brawner,* at page 998, "expert testimony as to a defendant's abnormal mental condition may be received and considered, as tending to show, in a responsible way, that defendant did not have the specific mental state required for a particular crime or degree of crime—even though he was aware that his act was wrongful and was able to control it, and hence was not entitled to complete exoneration." If the *Brawner* rule were applied to the case at bar, then appellee, even though legally sane, could present psychiatric testimony as to his abnormal mental condition (diminished capacity) to show that he did not have the specific mental state—in this instance, the purpose—required to commit the crimes with which he stands charged. However, our review of the history and policies underlying the diminished capacity concept and the experience of jurisdictions that have attempted to apply the doctrine militate against the adoption of a *Brawner*-type rule in Ohio.

The diminished capacity defense originated in Scotland more than a century ago "to reduce the punishment of the 'partially insane' from murder to culpable homicide, a noncapital offense. *See HM Advocate* v. *Dingwall,* [1867] J. C. 466." Arenella, *supra,* at page 830, fn. 16. The doctrine has been widely accepted overseas, see Arenella, *supra,* and Comment, Criminal Law—Partial Insanity—Evidentiary Relevance Defined, 16 Rutgers L. Rev. 174, 176-77, fn. 8, but most American jurisdictions, with the notable exception of California,[4] have been slow to embrace the concept. See Lewin, *supra,* at pages 1055, 1059, and Appendix; Goldstein, The Insanity Defense, at 195 (hereinafter Goldstein). While a number

sibility"); and Lewin, Psychiatric Evidence in Criminal Cases for Purposes Other Than the Defense of Insanity, 26 Syr. L. Rev. 1051 (hereinafter "Lewin") (distinguishing "causative partial responsibility" and "ameliorative diminished responsibility").

[4] See, *e.g., Wells, supra; Gorshen, supra; People* v. *Conley* (1966), 64 Cal. 2d 310, 411 P. 2d 911; *People* v. *Wolff* (1964), 61 Cal. 2d 795, 394 P. 2d 959. But, see, West's Anno. Cal. Penal Code Section 28 (1982 Supp.); West's Cal. Leg. Service 1981, Chapter 404 at page 1201, Section 4.

of states followed California's lead in adopting one form or another of the diminished capacity defense, see Annotation, 22 A.L.R. 3d 1228, the *Brawner* court may have overstated the case when it found that the doctrine was being "adopted by the overwhelming majority of courts that have recently faced the question." 471 F. 2d at page 1000.[5] A post-*Brawner* student note determined that the supposed trend detected in *Brawner* was continuing, stating that "in recent years a growing number of jurisdictions have recognized the concept of diminished capacity." Note, Diminished Capacity—Recent Decisions and an Analytical Approach, 30 Vand. L. Rev. 213, 214. At this juncture, however, it appears that enthusiasm for the diminished capacity defense is on the wane and that there is, if anything, a developing movement away from diminished capacity although the authorities at this point are still quite mixed in their views. See, *infra,* Parts I C and II; see, generally, Annotation, 22 A.L.R. 3d 1228.

The diminished capacity defense developed as a covert judicial response to perceived inequities in the criminal law. The purported justifications for the doctrine include the following:

"(1) it ameliorates defects in a jurisdiction's insanity test criteria; (2) it permits the jury to avoid imposing the death penalty on mentally disabled killers who are criminally responsible for their acts; and (3) it permits the jury to make more accurate individualized culpability judgments." Arenella, *supra,* at page 853.

In addition the diminished capacity defense has a certain logical appeal when juxtaposed against the settled rule that evidence of voluntary intoxication may be considered in determining whether an accused acted with the requisite specific intent. See *State* v. *Fox* (1981), 68 Ohio St. 2d 53. The analogy to the partial defense of voluntary intoxication figured prominently in the *Brawner* court's analysis. The court stated:

"Neither logic nor justice can tolerate a jurisprudence that defines the elements of an offense as requiring a mental state such that one defendant can properly argue that his voluntary

---

[5] The *Brawner* court included Ohio as a diminished capacity jurisdiction, citing *Nichols, supra,* but erroneously attributed the *Nichols* decision to the state's "highest court." 471 F. 2d at page 1000.

drunkenness removed his capacity to form the specific intent but another defendant is inhibited from a submission of his contention that an abnormal mental condition, for which he was in no way responsible, negated his capacity to form a particular specific intent, even though the condition did not exonerate him from all criminal responsibility." 471 F. 2d at page 999. Cf. *Wells, supra,* at page 357; *Gorshen, supra,* at pages 727-28. See, also, Lewin, *supra,* at page 1092, and Weihofen and Overholser, Mental Disorder Affecting the Degree of a Crime, 56 Yale L. J. 959, 962-963 (hereinafter "Weihofen").

Upon examination, however, we find none of the foregoing justifications for the defense of diminished capacity sufficiently compelling as to warrant its adoption, particularly in light of the problems posed by the doctrine, problems even its proponents acknowledge.[6]

## I A.

The diminished capacity defense does serve to ameliorate the limitations of the traditional, M'Naghten,[7] right from wrong test for insanity. It is no coincidence that California, which pioneered the diminished capacity defense, for many years adhered to a strict M'Naghten standard.[8] Justice Mosk of the California Supreme Court explicitly acknowledged the ameliorative effect of California's diminished capacity defense in *People* v. *Kelly* (1973), 10 Cal. 3d 565, 579-80, 516 P. 2d 875 (Concurring opinion):

"Efforts to 'get around' the M'Naghten rule were undertaken in New Hampshire as long ago as 1870 (*State* v. *Pike,* 49

---

[6] See, *e.g.,* Diamond, Criminal Responsibility of the Mentally Ill, 14 Stan. L. Rev. 59, 82-86 (hereinafter "Diamond"); Diamond, From Durham to Brawner, A Futile Journey, 1973 Wash. Univ. L. Q. 109, (hereinafter "Futile Journey"), Lewin, *supra,* 1089-1097; Note, A Punishment Rationale for Diminished Capacity, 18 U.C.L.A. L. Rev. 561, 570-572; Note, Keeping *Wolff* From the Door: California's Diminished Capacity Concept, 60 Cal. L. Rev. 1641, 1653-1655.

[7] *M'Naghten's Case* (H.L. 1843), 10 C. & F. 200, 8 Eng. Rep. 718.

[8] See, *e.g., Wells, supra,* at pages 352-354, and cases cited therein. The California Supreme Court abandoned its M'Naghten test in *People* v. *Drew* (1978), 22 Cal. 3d 333, 583 P. 2d 1318, and adopted the American Law Institute standard (Model Penal Code Section 4.01). See, also, Arenella, *supra,* at pages 854-855; Comment, The Diminished Capacity Defense in California; An Idea Whose Time Has Gone? 3 Glendale L. Rev. 311, 318.

N.H. 399, 429), by Judge Bazelon in 1954 in *Durham* v. *United States,* 214 F. 2d 862, by Chief Judge Biggs of the Third Circuit in *United States* v. *Currens* (1961) 290 F. 2d 751, 774, and by this court when in 1949 we adopted a significant variation of M'Naghten in *People* v. *Wells* (1949) 33 Cal. 2d 330, a thoughtful concept developed by Justice Schauer, and further explicated in *People* v. *Gorshen* (1959) 51 Cal. 2d 716.

"* * * [I]n *People* v. *Henderson* (1963) 60 Cal. 2d 482, 490, Justice Traynor frankly conceded the *Wells-Gorshen* 'purpose and effect are to ameliorate the law governing criminal responsibility prescribed by the M'Naghten rule,' * * *."

The ameliorative argument loses much of its force, however, in jurisdictions that have abandoned or expanded upon the narrow M'Naghten standard. The test for insanity in Ohio is set forth in *State* v. *Staten* (1969), 18 Ohio St. 2d 13, paragraph one of the syllabus, as follows:

"One accused of criminal conduct is not responsible for such criminal conduct if, at the time of such conduct, as a result of mental disease or defect, he does not have the capacity either to know the wrongfulness of his conduct or to conform his conduct to the requirements of law. * * *" (Citations omitted.)

While this standard is arguably less expansive than that espoused by the drafters of the Model Penal Code, see Section 4.01,[9] it is considerably more flexible than the M'Naghten rule.[10] The record in the case at bar, which is replete with expert testimony going to the question of appellee's sanity, illustrates the relative liberality of Ohio's insanity rule. Thus we see no reason to fashion a halfway measure, *e.g.,* diminished capacity, when an accused may present a meaningful insanity defense in a proper case. Cf. Lewin, *supra,* at page 1091 ("courts have used * * * [liberal insanity tests] as a reason to reject partial responsibility").

---

[9] Model Penal Code Section 4.01(1) states:

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law."

[10] In *Staten, supra,* at page 15, this court specifically acknowledged that the Ohio insanity rule is broader than M'Naghten. *Staten* also prefigured, at page 20, our diminished capacity ruling in *Jackson.*

The interplay between the diminished capacity doctrine and the insanity defense, moreover, is not limited to the supposed ameliorative effect of the former on the latter. Rather, as Dr. Diamond, among others, has observed, "[e]xperience with the diminished responsibility (or capacity) defense has been extensive in England and in California, and indicates that this defense does not just supplement the insanity defense, but tends to supersede it * * *" Futile Journey, *supra,* at page 124. Dr. Diamond, a leading proponent of the diminished capacity concept whose testimony is quoted at some length in *Gorshen, supra,* attributes the supersession of the insanity defense to the fact that a diminished capacity formulation "may well be a much more rational solution to the problem of the mentally ill offender." Futile Journey, *supra,* at page 124. Other commentators are far less sanguine about the tendency of diminished capacity to supplant the insanity defense:

"* * * 'partial responsibility' becomes an important alternative to the plea of insanity, particularly when the question of capital punishment is removed. The defendant facing a murder charge must then choose between, on the one hand, insanity and indeterminate commitment and, on the other, conviction and a long sentence, which may be reduced by parole. Some indication of how they choose is afforded by the recent English experience with 'diminished responsibility.' That plea has become so popular that it threatens to displace the insanity defense entirely." Goldstein, *supra,* at pages 195-196.

Professor Arenella notes that "[s]eriously disturbed defendants can avoid an indefinite commitment to a mental hospital for the criminally insane by relying on the diminished responsibility defense which frequently leads to a reduced term in prison." Arenella, *supra,* at page 854. According to this view, the principal practical effect of the diminished capacity defense is to enable mentally ill offenders to receive shorter and more certain sentences than they would receive if they were adjudged insane. Having satisfied ourselves that Ohio's test for criminal responsibility adequately safeguards the rights of the insane, we are disinclined to adopt an alternative defense that could swallow up the insanity defense and its attendant commitment provisions. See R. C. 2945.40.

## I B.

We can quickly dispose of the argument that the diminished capacity defense alleviates the harshness of the death penalty when mentally ill but nonetheless sane defendants are convicted of capital crimes.[11] While this rationale formerly had considerable force, and indeed may have been the underlying basis of *People* v. *Wells, supra,* recent United States Supreme Court decisions have limited capital crimes to a narrow range of cases.[12] Appellee faced no death penalty threat because Ohio's former capital punishment statute was struck down as unconstitutional in *Lockett* v. *Ohio, supra.* Moreover, under Ohio's recently enacted death penalty statute, which was not in effect when the instant case arose and on which we express no opinion herein, "* * * [w]hen death may be imposed as a penalty, the court, upon request of the defendant * * * shall require a mental examination to be made * * *." R. C. 2929.03(D)(1). Mental capacity is a formal mitigating factor in capital cases under current Ohio law at the punishment stage of the now bifurcated proceedings. Thus the ameliorative purpose served by the diminished capacity defense in capital cases has largely been accomplished by other means.

## I C.

The justifications for diminished capacity relating to the defense's potential for more accurate, individualized culpability judgments and its logical relevance are based largely on analogies to the insanity defense and the defense of intoxication, respectively. These arguments were discussed at some length in *Bethea* v. *United States* (D. C. App. 1976), 365 A. 2d

---

[11] See, *e.g.,* Model Penal Code Section 4.02(2) and Comment 2, Tentative Draft No. 4, at page 193.

[12] The court has spoken with many voices in the death penalty cases that have come before it in the last decade or so. What seems to be required as a minimum before capital punishment may be imposed are clear standards and a full consideration of mitigating factors so as to provide a "meaningful basis for distinguishing the few cases in which it [capital punishment] is imposed from the many cases in which it is not." *Furman* v. *Georgia* (1972), 408 U. S. 238, 313 (White, J., concurring). See, also, *Gregg* v. *Georgia* (1976), 428 U. S. 153; *Proffitt* v. *Florida,* (1976), 428 U. S. 242; *Jurek* v. *Texas* (1976), 428 U. S. 262; *Woodson* v. *North Carolina* (1976), 428 U. S. 280; *Roberts* v. *Louisiana* (1976), 428 U. S. 325; *Lockett* v. *Ohio* (1978), 438 U. S. 586; *Beck* v. *Alabama* (1980), 447 U. S. 625.

64, wherein the court voiced persuasive objections to the diminished capacity doctrine. *Bethea,* moreover, is of particular significance because the court expressly rejected the *Brawner* model of diminished capacity for the District of Columbia notwithstanding the fact that *Brawner* was a District of Columbia case.[13] The following language from *Bethea,* at pages 86-88, is relevant to the case at bar:

"Our principal objection to the *Brawner* dicta is its apparent abandonment of traditional legal theory. The essence of the diminished capacity concept embraced in that decision is that the circumstance of mental deficiency should not be confined to use as an all-or-nothing defense. * * * It is true, of course, that the existence of the required state of mind is to be determined subjectively in the sense that the issue must be resolved according to the particular circumstances of a given case. However, this fact may not be allowed to obscure the critical difference between the legal concepts of mens rea and insanity. * * * The former refers to the existence in fact of a 'guilty mind'; insanity, on the other hand, connotes a presumption that a particular individual lacks the capacity to possess such a state of mind. It is upon this distinction that the 'logic' of the diminished capacity doctrine founders. * * * The concept of insanity is simply a device the law employs to define the outer limits of that segment of the general population to whom these presumptions concerning the capacity for criminal intent shall not be applied. The line between the sane and the insane for the purposes of criminal adjudication is not drawn because for one group the actual existence of the necessary mental state (or lack thereof) can be determined with any greater certainty, but rather because those whom the law declares insane are demonstrably so aberrational in their psychiatric characteristics that we choose to make the assumption that they are incapable of possessing the specified state of mind. Within the

---

[13] "Prior to 1971, the federal courts in the District of Columbia were authoritative expositors of local as well as federal law, * * *. The situation changed radically when, in the early 1970's, Congress restructured the District of Columbia courts [District of Columbia Court Reorganization Act of 1970, Pub. L. No. 91-358, Title I, Section 111, 84 Stat. 475 (1973)], and reposed in them full responsibility for the development of the District's own law. From then onward, the relationship of the federal to the local judiciary was to be akin to that historically existent in the states." *Steorts* v. *American Airlines* (C. A. D. C. 1981), 647 F. 2d 194, 196.

range of individuals who are not 'insane,' the law does not recognize the readily demonstrable fact that as between individual criminal defendants the nature and development of their mental capabilities may vary greatly."

In the same vein as *Bethea,* the Wisconsin Supreme Court in *Steele* v. *State* (1979), 97 Wis. 2d 72, 294 N.W. 2d 2, recently made the following pertinent observations:

"* * * The determination of capacity to form an intent—to find whether or not the alleged offender intended to do, in the sense of the criminal law, what he in fact did—requires a fine tuning of an entirely different nature than that required for the admission of evidence on the general question of insanity for the determination of whether or not there should be criminal responsibility * * *. To make * * * [the insanity] determination requires no fine tuning. It is, rather, a gross evaluation that a person's conduct and mental state is so beyond the limits of accepted norms that to hold him criminally responsible would be unjust. This is a far cry from accepting testimony which purports to prove or disprove a specific intent, as distinguished from criminal responsibility. While some courts may have blind faith in all phases of psychiatry, this court does not. There is substantial doubt whether evidence such as was sought to be introduced here is scientifically sound, and there is substantial legal doubt that it is probative on the point for which it was asserted in this case." *Id.* at pages 96-97.[14]

Theoretically the insanity concept operates as a bright line test separating the criminally responsible from the criminally irresponsible.[15] The diminished capacity concept on the other

---

[14] *Steele,* moreover, represented a turnabout in Wisconsin law as the court overturned its prior decision in *Schimmel* v. *State* (1978), 84 Wis. 2d 287, 267 N.W. 2d 271, insofar as *Schimmel* had permitted the introduction of psychiatric evidence during the guilt phase of Wisconsin's bifurcated trial system.

[15] That the legal theory of insanity does not necessarily square with psychiatric concepts of mental illness is a point that has been frequently recognized and is the source of a good deal of the criticism aimed at the insanity defense. See, *e.g.,* Diamond, *supra,* at page 62 ("Central to the difficulties with any definition of legal insanity is the all-or-none conceptualization of the law. A defendant is either sane and totally responsible, or insane, and not at all responsible. Such all-or-none concepts are peculiarly foreign to modern psychiatric thinking. Neither normal persons nor mentally disturbed persons are ever 'all-or-none' in their psychological functioning"), and at page

hand posits a series of rather blurry lines representing gradations of culpability.[16] As Professor Arenella notes, at page 860, "[t]he analogy to the insanity defense is misleading because the diminished responsibility doctrine asks the expert witness and the jury to make a far more subtle distinction. The insanity defense asks both to distinguish between a large group of offenders who are punishable for their acts despite their mental deficiencies, and a small class of offenders who are so mentally disabled that they cannot be held accountable because they lack the minimal capacity to act voluntarily. The diminished responsibility doctrine attempts to divide the first large group of responsible sane offenders into two subgroups: a group of 'normal' fully culpable criminal offenders, and a group of mentally abnormal but sane offenders with reduced culpability." In light of the linedrawing difficulties courts and juries face when assessing expert evidence to make the "bright line" insanity determination, we are not at all confident that similar evidence will enable juries, or the judges who must instruct them, to bring the blurred lines of diminished capacity into proper focus so as to facilitate principled and consistent decision-making in criminal cases. In short, the fact that psychiatric evidence is admissible to prove or disprove insanity does not necessarily dictate the conclusion that it is admissible for purposes unrelated to the insanity defense.

The *Brawner* court emphasized the apparent illogic of permitting evidence of voluntary intoxication to be introduced to negate specific intent while precluding the introduction of evidence of an abnormal mental condition not amounting to insanity for the same purpose. While we concede that there is a superficial attractiveness to the intoxication-diminished capacity analogy, upon closer examination we, like the court in *Bethea*, find the concepts to be quite disparate. The *Bethea*

---

73 ("Modern psychoanalytic knowledge does not support the legal fiction of an absolute dichotomous distinction between the responsible and the irresponsible. * * * There is no 'all-or-none' in human psychology").

[16] Cf. Diamond, *supra*, at page 73:

"If, * * * there are innumerable kinds of *mentes reae*, then. I would assert that there must exist innumerable degrees of any particular *mens rea*. We thus arrive at a legal spectrum of an infinitely graduated scale of responsibility which corresponds, or could be made to correspond closely, to the psychological reality of human beings as understood by twentieth century medical psychology."

court addressed this precise point and stated, at page 88, as follows:

"The rule that evidence of intoxication may be employed to demonstrate the absence of specific intent figured prominently in the *Brawner* court's advocacy of consistency in the treatment of expert evidence of mental impairment. The asserted analogy is flawed, however, by the fact that there are significant evidentiary distinctions between psychiatric abnormality and the recognized incapacitating circumstances. Unlike the notion of partial or relative insanity, conditions such as intoxication, medication, epilepsy, infancy, or senility are, in varying degrees, susceptible to quantification or objective demonstration, and to lay understanding. As the Ninth Circuit observed in *Wahrlich* v. *Arizona,* 479 F. 2d 1137, 1138 (9th Cir.), certiorari denied, 414 U. S. 1011, 94 S. Ct. 375, 38 L. Ed. 2d 249 (1973):

" 'Exposure to the effects of age and of intoxicants upon state of mind is a part of common human experience which fact finders can understand and apply; indeed, they would apply them even if the state did not tell them they could. The esoterics of psychiatry are not within the ordinary ken.' "

It takes no great expertise for jurors to determine whether an accused was " 'so intoxicated as to be mentally unable to intend anything.(unconscious),' " *Jackson, supra,* at page 206, whereas the ability to assimilate and apply the finely differentiated psychiatric concepts associated with diminished capacity demands a sophistication (or as critics would maintain a sophistic bent) that jurors (and officers of the court) ordinarily have not developed. We are convinced as was the *Bethea* court, that these "significant evidentiary distinctions" preclude treating diminished capacity and voluntary intoxication as functional equivalents for purposes of partial exculpation from criminal responsibility.

## II.

We have examined the commonly asserted justifications for diminished capacity and have found them wanting. We have also looked at the leading California cases,[17] which attempted to apply the diminished capacity concept in a principl-

---

[17] See, *e.g.,* cases cited in fn. 4, *supra.*

ed manner, and have concluded that the California experience with diminished capacity does not inspire imitation. The California courts struggled to evolve a coherent diminished capacity framework but the difficulties inherent in the doctrine, *e.g.,* its subjectivity, its non-uniform and exotic terminology, its open-endedness, and its quixotic results in particular cases, were not overcome, and therefore consistent and predictable application of the diminished capacity concept in California became an elusive and unachieved goal.

Commentators, including proponents as well as opponents of diminished capacity, attempted to untangle the several strands of the California diminished capacity defense. Their conclusions are not overly heartening. See, *e.g.,* Fingarette & Haase, Mental Disabilities and Criminal Responsibility 117-133 (hereinafter "Fingarette") ("To have a variety of such diminished capacity formulas, arbitrarily shifting and even inconsistent with one another, as is the case at present, is unsatisfactory law," *id.* at 131); Arenella, *supra,* at pages 836-849 ("[D]octrinal morass * * * results from * * * [California] court's perpetration of the legal fiction that diminished capacity testimony can be correlated to different statutory state of mind requirements," *id.* at 848); Lewin, *supra,* at pages 1077-1089 and 1092-1096 ("The courts adopting the California doctrine have been unable to provide meaningful standards to guide the courts in assessing the quality and quantum of psychiatric evidence necessary to carry the defense. As a result there is no clear definition of the doctrine and no clear statement of the mental deficiency necessary to support the defense," *id.* at 1093); Comment, 18 U.C.L.A. L. Rev. *supra,* at pages 567-572 ("The inconsistent application of the [diminished capacity] defense, by which defendants in similar factual situations receive substantially different treatments, frustrates the criminal law's attempt to achieve equal treatment for all defendants similarly situated," *id.* at 570); Comment, 60 Cal. L. Rev., *supra;* Note, Restricting the Admission of Psychiatric Testimony on a Defendant's Mental State: Wisconsin's *Steele* Curtain, 1981 Wis. L. Rev. 733, 774-780 ("While the California experience indicates the pressures which exist to expand the range of relevant psychiatric testimony in the guilty determination process, the

experience of that State also indicates that a core of psychiatric testimony on mental states is highly relevant and highly reliable," *id.* at 777-778) (the writer does not, however, indicate how a court or jury is to distinguish "core" psychiatric testimony from irrelevant and unreliable "non-core" testimony). See, also, Comment, 3 Glendale L. Rev., *supra* (discussion of diminished capacity defense, which came to be known as "The Twinkie Defense" in popular press, successfully propounded in *People* v. *White,* S. F. Super. Ct. No. 98663 [1979], affirmed 117 Cal. App. 3d 270, 172 Cal. Rptr. 612 [1981]). Moreover, confusion existed in California with respect to the applicability of the diminished capacity concept in the felony murder context. Compare *People* v. *Ireland* (1969), 70 Cal. 2d 522, 450 P. 2d 580, with *In re Saunders* (1970), 2 Cal. 3d 1033, 472 P. 2d 921. See Note, The Diminished Capacity Defense to Felony Murder, 23 Stan. L. Rev. 799.

The upshot of the doctrinal confusion and the public outcry over cases like *People* v. *White, supra,* finally prompted the California legislature to abolish the diminished capacity defense by statute. See West's Anno. Cal. Penal Code Section 28 (1982 Supp.); West's Cal. Leg. Service 1981, Chapter 404, at page 1201, Section 4. Thus the diminished capacity concept has been repudiated in the very jurisdiction that formerly gave the greatest credence to the doctrine.

The open-endedness of the diminished capacity doctrine troubles us as well. Under the California rule evidence of diminished capacity could only be introduced to negate the mental element in crimes requiring specific intent. The specific intent limitation imposed by the California courts did not, however, flow from the theory underlying the diminished capacity doctrine and, indeed, may have been in direct conflict therewith.[18] The *Bethea* court, at page 90, acknowledged this theoretical incongruity in its discussion of *Brawner:*

[18] See, *e.g.,* Fingarette, *supra,* at pages 129-130; Arenella, *supra,* at page 832, fn. 25; Weihofen, *supra,* at pages 977-978. Cf. Diamond, *supra,* at page 83:

"The next step * * * is to expand the principle of limited or diminished responsibility of the mentally ill offender to include all definitions of crime. It was easier to introduce this principle in the crimes of homicide because there already existed the legal structure of graduated responsibility for homicide. But when the courts, and particularly the public, get used to the idea of giving full consideration to the mental and emotional abnormalities of the homicide offender, there will be little difficulty in having the same principles and practices applied to all crimes."

"The *Brawner* court did indicate that for the time being the admission of psychiatric evidence of diminished capacity would be limited to the trial of offenses involving specific intent. * * * We are not satisfied that the rule could be confined to easily. Assuming the competency of experts to testify as to an accused's capacity for specific intent we see no logical bar to their observations as to the possible existence or lack of malice or general intent. Moreover, it does not appear to us that the balance between the evidentiary value of medical testimony and its potential for improper impact upon the trier would very sufficiently as between the various degrees of mens rea to warrant such an artificial distinction." (Citation omitted.) If however, in the interests of doctrinal purity evidence of diminished capacity were admitted to disprove the mental element in general intent crimes, then "successful application of the diminished capacity doctrine * * * would create the anomalous result of a 'partial defense' leading to outright acquittal of the defendant because of the absence of a lesser included offense." Arenella, *supra,* at page 832, fn. 25. This "anomalous result," although a theoretical possibility is unlikely to be countenanced by courts because "[t]he complete acquittal of such offenders would release from state control the very persons society should probably fear most—because their endowments are fewer, because they are more suggestible, more manipulable, more fearful." Goldstein, *supra,* at page 202. Nevertheless, the potential applicability of diminished capacity as a complete defense to crimes of general intent dramatically highlights the paradox inhering in the doctrine:

"The subjective [diminished capacity] theory classes as less serious the offender who is less culpable; assuming him to be less 'guilty,' it proceeds to class him as less dangerous and either reduces the length of time he may be detained or releases him entirely. Yet his objective behavior may mark him as extremely dangerous and seriously in need not only of correction and treatment but of detention as well." *Id.* This paradox did not escape notice in *Bethea,* wherein the court quoted the pre-*Brawner* case of *Fisher* v. *United States* (C. A. D. C. 1945), 149 F. 2d 28, affirmed 328 U. S. 463 (1946), for the proposition that " 'it is obvious that brutal murders are

not committed by normal people. To give [such] an instruction * * * is to tell the jury that they are at liberty to acquit one who commits a brutal crime because he has the abnormal tendencies of persons capable of such crimes.' " *Bethea, supra,* at page 85, quoting *Fisher, supra,* at page 29. Under a diminished capacity regime, however, the more brutal, bizarre, or sensational the crime, the greater is the likelihood of a successful diminished capacity defense.[19] "Psychiatry's elastic definitions of mental abnormality easily encompass anyone who kills another human being without justification or excuse because such an act demonstrates a serious deviation from cultural and social norms. From such abnormality, the expert can readily infer that the accused had extreme difficulty in obeying the law and is therefore entitled to formal mitigation." Arenella, *supra,* at page 858. In other words, the commission of the offense in most instances becomes *ipso facto* evidence of diminished capacity.

"While there may be superficial appeal to the idea that the standards of criminal responsibility should be applied as subjectively as possible, the overriding danger of the disputed doctrine is that it would discard the traditional presumptions concerning mens rea without providing for a corresponding adjustment in the means whereby society is enabled to protect itself from those who cannot or will not conform their conduct to the requirements of the law. *Bethea supra,* at page 90. Thus, the effect of adopting a diminished capacity model transcends the doctrine's potential to transform criminal trials into psychiatric shouting matches. Rather, the diminished capacity theory forcefully challenges conventional concepts of culpability and "involve[s] a fundamental change in the common law theory of responsibility." *Fisher, supra,* 328 U. S. at 476. Echoing *Bethea,* "[w]e conclude that the potential impact of concepts such as diminished capacity or partial insanity—however labeled—is of a scope and magnitude which

---

[19] Arguably this was the California experience with the diminished capacity defense. See, *e.g., People* v. *Wolff, supra; People* v. *Goedecke* (1967), 65 Cal. 2d 850, 423 P. 2d 777; *People* v. *Nicolaus* (1967), 65 Cal. 2d 866, 423 P. 2d 787; *People* v. *Bassett* (1968), 69 Cal. 2d 122, 443 P. 2d 777 (brutal murders reduced in degree pursuant to California's diminished capacity rule). But, see, *People* v. *Sirhan* (1972), 7 Cal. 3d 710, 497 P. 2d 1121.

precludes their proper adoption by an expedient modification of the rules of evidence. If such principles are to be incorporated into our law of criminal responsibility, the change should lie within the province of the legislature." *Bethea supra,* at page 92. See *Fisher, supra,* 328 U. S. at page 476.

We hold, therefore, that the partial defense of diminished capacity is not recognized in Ohio (*State* v. *Jackson, supra* [32 Ohio St. 2d 203], followed) and consequently, a defendant may not offer expert psychiatric testimony, unrelated to the insanity defense, to show that the defendant lacked the mental capacity to form the specific mental state required for a particular crime or degree of crime.

For the reasons hereinbefore stated, the judgment of the Court of Appeals is reversed.

*Judgment reversed.*

CELEBREZZE, C. J., COOK, C. BROWN and PALMER, JJ., concur.

LOCHER and HOLMES, JJ., concur in the syllabus and judgment.

COOK, J., of the Eleventh Appellate District, sitting for W. BROWN, J.

PALMER, J., of the First Appellate District, sitting for KRUPANSKY, J.