OPINION
At approximately 1:43 AM on March 3, 1999, Officers Eversole and Donnell were dispatched separately to 4000 Quail Bush Drive on a possible domestic violence call. Officer Eversole arrived first, finding Appellant Douglas Tobias and his stepfather, Thomas Reed, standing in the driveway of the residence. As he approached the two men, the officer asked, "What's going on this evening?" Mr. Reed answered that his son had gotten into an argument with his wife and something had happened. He then advised Officer Eversole that once he went into the residence, he needed to decide how far to take it. At about this time, Officer Donnell had arrived at the residence and began knocking on the door to try to make contact with someone inside.
Meanwhile, Tobias explained to Officer Eversole that his wife came home late from a party, they got into an argument and "something bad has happened." Tobias began crying at this point. Also during his explanation, he mentioned the three children were home at the time this "bad thing" took place. Once he regained his composure, Officer Eversole walked him over to his cruiser and advised that he was going to try to make contact with Sherry, Tobias' wife. While he was being placed in the cruiser, the officer told Tobias twice that he was not under arrest. Tobias responded that the officer should go ahead and arrest him because something bad has happened. He further said "you need to go on in my house, sir, and do what you got to do."
About the same time Officer Eversole was placing Tobias in the cruiser, Mr. Reed handed him a key to the residence. Officers Eversole and Donnell entered the residence together, but headed in separate directions. Officer Eversole discovered the body of Sherry Tobias lying on the kitchen floor. Immediately thereafter, Officer Donnell went outside to secure the front of the residence and Tobias, while Officer Eversole did a protective sweep of the house, looking for more potential victims or suspects. When he did not find the children mentioned by Tobias, the officer radioed to Officer Donnell and found out that all three children were safe at Mr. Reed's home. When he returned to the body, he noticed two knives laying near the victim and radioed his partner to that effect. Officer Eversole remained in the home near the body until he was relieved by his Sergeant and told to wait in the cruiser with Tobias for the homicide detectives to arrive.
By the time Officer Eversole came back outside, Tobias had already been handcuffed. He asked him only the names and ages of the children that lived in the home, there was no further conversation between them. At one point while waiting for the homicide detectives, Tobias vomited out the side of the car. Also during this waiting period, Officer Eversole moved his cruiser about halfway down the block to avoid contact with the media and crowds that had begun to gather.
At approximately 2:40 AM, Detective Burke arrived at the scene. He discussed the situation with other officers, and then entered the back seat of Officer Eversole's cruiser to speak with Tobias. Detective Burke introduced himself and reviewed the consent to search form with Tobias. After filling in all of the blanks and reading the form to Tobias, Detective Burke asked him if he understood, which he did. He then asked if Tobias would allow the officers to search his residence, and he agreed. Tobias did not sign the form because his hands were cuffed behind his back, so Burke wrote "verbal okay" on the form. Both Detective Burke and Officer Eversole signed the form as witnesses. Burke then advised the other officers to search the residence.
Shortly thereafter, Burke returned to the back seat of the cruiser and reviewed the pre-interview rights form with Tobias. He asked him all of the preliminary questions, including name, social security number, years of schooling, et cetera, and then went over each paragraph individually. Following each right, he asked Tobias if he had any questions about that particular right. Each time, Tobias stated that he had no questions and that he understood. After reading all five rights, Burke read the waiver of rights portion and asked Tobias if he understood and was willing to answer questions, to which he responded that he was. Again, Burke wrote "verbal okay" on the signature line to avoid having Tobias exit the vehicle amidst all of the media to remove his handcuffs.
Once his Miranda rights were read and waived, Burke asked Tobias what had happened that evening. Tobias began describing the events of the evening, making incriminating statements. Throughout the conversation, Tobias was fidgety and agitated, but was not crying. Burke described him to be upset, occasionally rocking back and forth, but not animated. The conversation only lasted about fifteen minutes when Detective Burke advised Officer Eversole to take Tobias down to the Safety Building.
Detective Burke arrived at the Safety Building at approximately 4:45 AM, and along with Detective Salyer, continued interviewing Tobias regarding his wife's death. Miranda warnings were not repeated. The following is Tobias' description of the facts.
When Tobias came home from work on the evening of March 2, 1999, all three children were home, but his wife was not. She had indicated to him that she would be attending a home interior party and then going to her parents' home afterward, so he did not expect her home at that time. However, both he and his fourteen-year old stepdaughter, at separate times had called Sherry's parents' home looking for Sherry around 9:00 PM. She was not there. Tobias and the three children went to bed at 10:00. Before going to bed, Tobias left a note for his wife asking her to put his clothes in the wash and to kiss him goodnight.
Tobias stated that he was awakened around midnight to some noise downstairs. He came down and found Sherry was home and had just made a sandwich. He asked her how the party was, they chatted briefly, and he turned to go back to bed. Before he could leave, she told him they needed to talk. Sherry advised him she wanted him to move out because she had found someone else, and had been with him all day. She told Tobias if he caused problems, she would not let him see the kids. At this point, a struggle ensued in the living room, wherein Tobias hit Sherry several times with his fist. Eventually, the struggle proceeded into the kitchen where Tobias stabbed his wife several times with two separate kitchen knives in the chest and arms. Sherry was pronounced dead at the scene as a result of these wounds.
The defense filed a motion to suppress both the search of 4000 Quail Bush and statements made by Tobias at various stages on March 3, 1999. Additionally, the State filed a motion in limine to preclude the testimony of Dr. J. Daniel Barna, a psychologist called by the defense to testify about Tobias' personality and his rage on the night of his wife's death. The Court overruled both motions, however, Dr. Barna's testimony was limited to establishing that Tobias acted in a sudden fit of rage when he killed his wife. He was not permitted to testify regarding a specific diagnosis of Tobias.
At trial, Barna testified regarding several of Tobias' personality traits developed throughout his childhood and adulthood. Based on these personality traits, Dr. Barna testified that "if the right buttons were pushed," Tobias would be prone to sudden fits of rage.
The Court instructed on two counts of murder and the lesser included offense of voluntary manslaughter. Tobias was found guilty by the jury of both counts of murder, and was sentenced by the Court to fifteen years to life. Tobias now appeals this conviction, raising the following assignments of error:
 The trial court erred in overruling Defendant's motion to suppress evidence.
The State of Ohio failed to demonstrate by clear and convincing evidence that Defendant's consent to search was freely and voluntarily given.
Statements obtained from Defendant without appropriate Miranda warnings should have been suppressed.
The trial court erred in limiting the testimony of Defendant's expert psychologist, J. Daniel Barna, PhD.
 IA
In his first assignment of error, Tobias argues that the trial court should have sustained his motion to suppress evidence obtained from the search of his residence, and statements made in violation of Miranda. In reviewing the decision on a motion to suppress, the appellate court must accept the factual findings of the trial court as long as they are supported by competent and credible evidence. State v. Retherford (1994), 93 Ohio App.3d 586,592. However, the appellate court reviews application of the law to the facts de novo. Id.
Tobias initially argues in his first assignment of error that his consent to search the residence was not voluntarily given. A consensual search is a waiver of an individual's Fourth Amendment rights, and therefore must be voluntary to be effective.Schneckloth v. Bustamonte (1973), 412 U.S. 218, 221; State v.Childress (1983), 4 Ohio St.3d 217, paragraph one of the syllabus. The prosecutor bears the burden to prove consent was voluntary by clear and convincing evidence. State v. Pierce (1998), 125 Ohio App.3d 592,598, citing Bumper v. North Carolina (1968), 391 U.S. 543, 548. Voluntariness is determined by reviewing the totality of the circumstances, for which we employ a six-factor test:
(1) The voluntariness of the defendant's custodial status;
(2) The presence of coercive police procedures;
 (3) The extent and level of the defendant's cooperation with the police;
(4) The defendant's awareness of his right to refuse to consent;
(5) The defendant's education and intelligence; and
 (6) The defendant's belief that no incriminating evidence will be found.
 State v. Webb (Jan. 28, 2000), Montgomery App. No. 17676, unreported, at p. 3. Under the first factor, an individual need not be advised that he is "free to go" in order for a consent to search to be voluntary. Ohio v. Robinette (1996), 519 U.S. 33,39-40. Even in an arrest situation the consent to search is not vitiated, because the focus is whether the officers used coercive tactics or took advantage of the arrest situation to obtain consent. State v. Clelland (1992), 83 Ohio App.3d 474, 481. Although, if an individual is under arrest, the officer must have probable cause to search and advise the suspect of his rights.State v. Taylor (1995), 106 Ohio App.3d 741, 749. In the present case, the officers had already found the body of Sherry Tobias in the home and had incriminating statements from Appellant regarding her murder. The officers undoubtedly had probable cause to search the residence to find evidence regarding the crime. Further, before obtaining his consent, Detective Burke thoroughly reviewed the consent to search form with Tobias, advising him of his right to refuse. Tobias indicated that he understood and allowed the officers to search his residence.
Additionally, Tobias stressed in his brief that the consent was involuntary because he was not read his Miranda warnings prior to giving his consent. However, the weight of authority has held that prior Miranda warnings are not necessary for a consent to search to be voluntary. State v. Lee (Oct. 31, 1997), Greene App. No. 96 CA 115, unreported, at p. 6; Clelland, supra. A consent to search is not testimonial, and therefore does not implicate the Fifth Amendment rights that Miranda is designed to protect. Lee,supra, at p. 5 (citations omitted).
In reviewing the remaining factors, we find no evidence that Tobias' consent to search was involuntary. None of the officers involved used coercive measures in order to obtain Tobias' consent. Detective Burke simply reviewed the form, advised him he had a right to refuse, then Tobias consented to the search. While reviewing the form, Burke discovered that Tobias had a high school education, and noticed that he read the form along with him, so there was no indication that his intelligence level affected his consent. Moreover, Burke testified that although Tobias was upset and concerned, he did not feel his emotional state influenced his consent, because he was coherent and responded appropriately to preliminary questions. Finally, Tobias was completely cooperative with the police, even though he was fully aware that incriminating evidence would be found inside the home.
As further evidence of voluntary consent, before anyone had entered the residence, Tobias told Officer Eversole to "go in my house, sir, and do what you got to do." This initial consent was offered before Tobias was placed in custody, and was probably sufficient in itself to allow the officers to search the home. With the added precaution of the consent form, the search was clearly valid.
Based on the totality of the circumstances, we find that Tobias' consent to search was voluntarily given. Accordingly, this portion of his first assignment of error is overruled.
 IB
Tobias alleges that two separate sets of statements were obtained in violation of Miranda and should have been suppressed: those made to Officer Eversole when he first arrived on the scene, and those made at the police station to Detectives Burke and Salyer. We will first address the statements made to Officer Eversole.
Miranda warnings are only required "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." Miranda v. Arizona (1966), 384 U.S. 436, 478. Custody exists when a reasonable person in the defendant's position would not have felt free to leave. United States v.Mendenhall (1980), 446 U.S. 544, 554. In this regard, the focus is not whether leaving would be inadvisable, but whether "by means of physical force or show of authority, his freedom of movement is restrained." State v. Hoaja (June 4, 1999), Montgomery App. No. 17383, unreported, at p. 3, citing Mendenhall, 446 U.S. at 553. Moreover, the fact that an individual is the focus of an investigation is not determinative of whether he is in custody. See Hoaja, supra, at p. 4; State v. Walker (Sept. 16, 1997), Franklin App. No. 97APA02-212, unreported, at p. 3.
When Officer Eversole arrived at 4000 Quail Bush on March 3rd, he only knew that it was a possible domestic violence call and the caller's son may have hurt his wife. He approached two men standing in the driveway of the residence and asked "What's going on this evening?" In response to this question, Tobias made some incriminating statements. Even if we assume that Officer Eversole considered Tobias the focus of the investigation, he clearly was not in custody when the officer approached him in the driveway. Moreover, although Tobias made statements as he was placed in the police cruiser, Officer Eversole advised Tobias twice that he was not under arrest. Tobias made no further incriminating statements once he entered the cruiser prior to being Mirandized by Detective Burke.
After examining all of the circumstances surrounding this set of statements made by Tobias, it is evident that he was not in custody, and therefore Miranda warnings were not required.
Next, Tobias argues that the statements made at the police station should have been suppressed because Miranda warnings given at the scene had become stale. The Ohio Supreme Court recognized that it was possible for the effectiveness of Miranda warnings to be diluted if there has been a significant lapse in the investigation. State v. Roberts (1987), 32 Ohio St.3d 225, 232. The focus should be whether the individual is aware of his rights at the time the interrogation occurs. State v. Butler (Sept. 18, 1998), Montgomery App. No. C.A. 16852, unreported, at p. 3. In order to determine if the warnings have become stale, a totality of the circumstances test is employed involving the following criteria:
 (1) The length of time between the giving of the first warnings and subsequent interrogation, (2) whether the warnings and the subsequent interrogation were given in the same or different places, (3) whether the warnings were given and the subsequent interrogation conducted by the same or different officers, (4) the extent to which the subsequent statement differed from any previous statements, and (5) the apparent intellectual and emotional state of the suspect.
 Butler, supra, citing Roberts, 32 Ohio St.3d at 232.
In Roberts, the warnings were given to the defendant at his girlfriend's home, possibly not in the context of an interrogation, approximately two hours prior to his interrogation at the county jail. Additionally, the warnings were given by a police officer, while the interrogation was conducted by Roberts' probation officer, with whom he had a prior relationship. The supreme court found these warnings were not sufficient to satisfy the totality of the circumstances test. Id. at 233. In making this finding, the court focused mainly on Roberts' prior relationship with his probation officer, and the likelihood that he would expect such conversations to be confidential.
In a different case, the supreme court found Miranda warnings had not become stale when incriminating statements were made by a defendant close to twenty-four hours following the warnings.State v. Brewer (1990), 48 Ohio St.3d 50, 59-60. Brewer was given Miranda warnings by police officers at the station at 6:43 PM, and he made incriminating statements without subsequent warnings well into the next day. In reviewing the totality of the circumstances, the court relied on Brewer's indication that he understood his rights at the time the warnings were given, and that the statements occurred during a series of discussions held with the police officers. Further, the statements made were simply elaborations of information that was relayed in earlier statements. Id. at 60.
This court found that Miranda warnings had not become stale when given five hours before an interrogation occurred. Butler,supra. In Butler, the defendant was given his Miranda warnings at a jail in Florida at approximately 1:30 PM by a detective. The same detective who was accompanying him back to Ohio from Florida engaged him in conversation in the Atlanta airport at 6:30 PM, at which time the defendant made incriminating statements. We found it significant that the same detective had read his warnings and later questioned him in the course of the same custodial episode, and that the defendant fully understood his rights at the time they were read. Id. at p. 4.
In the present case, Detective Burke reviewed the Miranda form with Tobias at approximately 3:00 AM in the back of Eversole's cruiser. Although he was upset, Burke did not feel Tobias' emotional state impaired him to an extent that he did not understand his rights. Burke indicated that he answered all preliminary questions appropriately, advising among other things that he had a high school education. Tobias clearly indicated at that time that he understood his rights and wanted to speak with Burke. During this brief conversation, Tobias made incriminating statements regarding his wife's murder. Less than two hours later, Detective Burke again questioned Tobias at the police station, along with another detective. At this time, Tobias elaborated on the events of the evening, disclosing specific details about his wife's murder. Detective Burke testified that Tobias was concerned, but composed while he was questioned at the police station. Again, he had no reason to believe that his emotional state prevented him from understanding the rights he had waived earlier in the evening.
After reviewing these facts in consideration of the totality-of-the-circumstances factors, we find that the Miranda warnings given to Tobias at the scene did not become stale by the time he was interrogated at the police station. Although two separate locations were involved, the same detective read the Miranda warnings and conducted the interrogation less than two hours later. Further, the statements made at the police station were simply more detailed description of events already revealed at the scene. And finally, Tobias' emotional and intellectual state did not impair his ability to fully understand his rights.
Based on the foregoing, the trial court did not err in overruling Tobias' motion to suppress, and therefore, his first assignment of error is overruled.
 II
In his second assignment of error, Tobias argues that the trial court should not have limited the testimony of expert psychologist Dr. Barna. The Court did allow Dr. Barna to testify as it related the sudden fit of rage element of voluntary manslaughter, but did not allow him to relate his diagnosis of borderline personality disorder.
The Ohio Supreme Court has held that once the preconditions for admissibility of expert testimony have been met, trial courts have discretion to decide on a case-by-case basis whether the testimony is relevant and therefore admissible. State v.Williams (1983), 4 Ohio St.3d 53, 58. Therefore, the trial court's decision will not be disturbed absent an abuse of that discretion. Wightman v. Consolidated Rail Corp. (1999), 86 Ohio St.3d 431,437. Relevant evidence is defined as having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Therefore, evidence supporting defendant's version of events or regarding his state of mind at the time of the incident would be relevant to his defense.State v. Nemeth (1998), 82 Ohio St.3d 202, 207.
However, a defendant may not offer expert testimony to show that he had a diminished mental capacity and therefore could not "form the specific mental state required for a particular crime or degree of crime." State v. Wilcox (1982), 70 Ohio St.2d 182, paragraph two of the syllabus. If a defendant cannot present a meaningful insanity defense, testimony regarding any mental deficiencies that fall short of insanity is not admissible. Id.
at 188. Specifically, the Supreme Court stated, "[w]ithin the range of individuals who are not `insane,' the law does not recognize the readily demonstrable fact that as between individual criminal defendants the nature and development of their mental capabilities may vary greatly." Id. at 191-92 (citations omitted). In this case, we must determine if the failure to allow admission of the diagnosis of borderline personality disorder materially prejudiced Tobias in his attempt to show the mitigating factors of voluntary manslaughter, or if it was being offered as a diminished capacity defense.
A voluntary manslaughter instruction is proper when the defendant, "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force," knowingly caused the death of the victim. R.C. 2903.03(A). The "reasonably sufficient" serious provocation element has been broken down into two essential components. State v. Shane (1992), 63 Ohio St.3d 630,634. First, an objective standard is applied to determine if the provocation was "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." Id. at 635. Generally, mere words are not sufficient provocation. Id.
at paragraph two of the syllabus. If this objective standard is met, the inquiry shifts to a subjective standard to determine if this particular defendant was actually embroiled in a sudden fit of passion or rage at the time the incident occurred. Id. at 634. It is not until this point that the defendant's state of mind and the circumstances surrounding him are considered. Therefore, if the objective standard of reasonable provocation is not satisfied, there is no need to examine the defendant's subjective state of mind. Id.
Although the Shane court held that words alone will not constitute reasonably sufficient provocation in most situations, they did find that a trial judge must examine the evidence in each case in a light most favorable to the defendant to determine whether a voluntary manslaughter instruction is warranted. Id. at 637. In Shane, the defendant was allegedly provoked by his fiancee's verbal admission of sexual infidelity after he repeatedly asked her questions in an attempt to get her to confess. The court found that "[w]ords informing another of infidelity should not be given special treatment by courts trying to determine what provocation is reasonably sufficient provocation." Id. Further, Shane offered an expert psychologist's testimony regarding his subjective propensity to be provoked in this particular situation. However, even if he subjectively could be provoked into a sudden fit of passion or rage, this does not abate the objective requirement that a reasonable person would be provoked under the circumstances. Consequently, after viewing all of the evidence and focusing on the fact that Shane was provoked by words alone, the court concluded that no jury could have decided he was sufficiently provoked by the victim, so no voluntary manslaughter instruction was warranted. Id. at 637-38.
This case is similar to Shane in that Tobias was also allegedly provoked by his wife's words informing him that she was having an affair and wanted to end their relationship. Although we are not faced with the question of whether the voluntary manslaughter instruction was proper, it is likely that in light of the Shane holding, the provocation was not reasonably sufficient to satisfy the objective test.
Assuming arguendo that the objective test was satisfied, we must decide if the expert testimony regarding the subjective standard was properly limited. This court has held that a defendant is entitled to offer expert testimony when a voluntary manslaughter instruction is given to prove that the defendant acted in a sudden fit of rage. State v. Sanders (July 21, 2000), Montgomery App. 17718, unreported, at p. 9. In Sanders, though, we found the trial court erred by failing to permit any expert testimony regarding the mitigating circumstances of voluntary manslaughter. The present case can be distinguished because expert testimony was allowed, but limited.
We fail to see how Tobias was materially prejudiced by the trial court prohibiting testimony as to diagnosis of a specific psychological disorder. Dr. Barna testified in detail regarding Tobias' personality traits and how he could be prone to sudden fits of passion or rage "if the right buttons were pushed." The trial court enjoys broad discretion in the admission of evidence, and we do not find the discretion was abused by limiting Dr. Barna's testimony. Accordingly, Tobias' second assignment of error is overruled.
 ______________________ BROGAN, J.
GRADY, P.J., and WOLFF, J., concur.