[Cite as *State v. Brown*, 2014-Ohio-888.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| STATE OF OHIO | JUDGES: |
|---|---|
| | Hon. W. Scott Gwin, P. J. |
| Plaintiff-Appellee | Hon. John W. Wise, J. |
| | Hon. Craig R. Baldwin, J. |
| -vs- | |
| | Case No. 2013 AP 05 0021 |
| MARY D. BROWN | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:      Criminal Appeal from the Court of Common Pleas, Case No. 2012 CR 08 0230


JUDGMENT:      Affirmed in Part; Reversed in Part and Remanded


DATE OF JUDGMENT ENTRY:      March 7, 2014


APPEARANCES:

For Plaintiff-Appellee      For Defendant-Appellant

RYAN D. STYER      VALERIE KUNZE
PROSECUTING ATTORNEY      ASSISTANT STATE PUBLIC DEFENDER
125 East High Avenue      250 East Broad Street, Suite 1400
New Philadelphia, Ohio 44663      Columbus, Ohio 43215

*Wise, J.*

{¶1} Appellant Mary D. Brown appeals her sentence and conviction entered in the Tuscarawas County Court of Common Pleas following a jury trial.

{¶2} Appellee is the State of Ohio.

### STATEMENT OF THE FACTS AND CASE

{¶3} Appellant Mary Brown and her husband Ralph Brown were married in 1973. In 1976, Ralph Brown enlisted in the Navy and began what would be a 20-year career as a fire control technician on submarines. His job required him to be away for 3 months, home for 3 months, etc. During those 20 years, the Browns lived in Connecticut, Virginia and Washington.

{¶4} In 1990, while the couple was living in Connecticut, Appellant's right arm was amputated due to cancer. In 1996, Mr. Brown retired and the couple returned to Ohio. In 2005, Appellant had to have her right leg amputated after numerous surgeries caused by a MRSA infection.

{¶5} On the night of August 17, 2012, Mr. Brown went to bed sometime around 10:30 p.m. - 12:00 midnight. (T. at 237, 275). When he went to bed that night, his wife was already in bed. (T. at 282). The next thing he remembers is waking to a loud shot and finding himself covered in blood. *Id.* He recalled asking Appellant if she knew what had happened and she said she did not know. (T. at 238). Mr. Brown went to the kitchen to get an icepack for his head and then went into the bathroom to look at himself in the mirror. *Id.* He stated that he could tell that he had been shot. *Id.* He took a shower to clean off the blood, than asked Appellant if she could see anything. *Id.* She

replied that he had a little hole in the back of his head and maybe a scratch in the front. *Id.*

{¶6} When Mr. Brown went back into the bedroom to get dressed, he observed a hole in the headboard of the bed with an object in it. He said at the time that he thought that if it was a bullet in that hole, it must have came in from outside. (T. at 241, 243, 271-272).

{¶7} Mr. Brown decided to go to the hospital and have an x-ray performed. *Id.* Once at the hospital, a doctor confirmed that he had a "superficial" bullet hole in his head. (T. at 244, 252). The hospital contacted the police and Detective Orvis Campbell came to the hospital to investigate. (T. at 244). Det. Campbell asked Mr. Brown if he had attempted suicide.

{¶8} Upon returning home with the Sheriff's deputy, a search of the windows and outside walls was done which revealed that the bullet did not enter from outside the house. (T. at 243). Mr. Brown stated that it was at this time that he first realized what had happened, that Appellant had shot him. (T. at 243-245).

{¶9} After arriving at the house and looking at the scene, detectives questioned Appellant a second time. (T. at 251, 408). At that time Appellant confessed "I shot him". (T. at 251, 408-409). She turned over the gun she used to the officers. (T. at 352). The gun was inside a sock, inside a bag, hidden in the closet. *Id.* Appellant was arrested and charged with attempted murder with a forearm specification and tampering with evidence.

{¶10} A jury trial was held in this matter on February 26, 27, 28 and March 1, 4, 5, 6 , 2013.

{¶11} At trial, Mr. Brown testified that about two weeks before the shooting, Appellant brought the revolver home with her from her son's house, explaining that her son did not want it in his home, around his children. (T. at 247-248, 287-288). He said that he was unfamiliar with this particular type of revolver because it did not have a hammer. (T. at 248). He further stated that the gun was loaded when Appellant brought it home, but that he unloaded it and placed the bullets inside a tan sock in which the gun was being kept. (T. at 248-249). He stated that he then placed the gun, which was in the sock, on a bench located in the rec room. (T. at 250). About one week later, he noticed the gun was no longer on the bench and asked Appellant what happened to it. (T. at 250-251). Appellant told him that her son came and picked up the gun. *Id.*

{¶12} Detective Campbell testified that during his interview with Appellant at the house she told him that she was laying in bed next to her husband when she shot him. (T. at 413). He said she was rambling about being frustrated about the fact that her husband withheld money from her. (T. at 408-410).

{¶13} Detective Campbell conducted a third interview with Appellant at the Sheriff's Office, which was recorded and played at trial. (T. at 415-467). During this interview, Appellant told Det. Campbell "I love him still no matter what. I love him. I just flipped out." (T. at 421). She went on to tell Det. Campbell that the night she shot her husband was the 30-year anniversary of when she had attempted suicide. (T. at 423-427). She said she was 8 months pregnant at the time and the suicide attempt resulted in her going into premature labor. (T. at 423-427). She said she was considering attempting suicide again that night but then thought why should she do that and let him still have fun. (T. at 437). Appellant then stated that she decided to put the gun away

but that when she tried to get out of bed, she lost her balance and her finger slipped on the trigger. (T. at 440-441).  She went on to tell Det. Campbell "I did snap in my mind" and "I'm not okay". (T. at 449, 456).  She also stated that she called her son and told him that she shot Ralph because she just couldn't handle things anymore. (T. at 452).

{¶14} Detective Moore testified that during his interview with Appellant, she explained "I was laying in my bed. I was scared. I was so afraid that I forgot to pull the gun out of the sock when I pulled the trigger." (T. at 353).  She further explained that she pointed the gun and closed her eyes and that her hand was shaking. (T. at 353, 382).

{¶15}  The Browns' neighbor Cheri Harris also testified. She stated that Appellant had discussed with her that her and her husband had some issues involving the way money was spent and that she was frustrated by it. (T. at 333).   She further testified that on a couple of occasions, Appellant had mentioned that she was considering divorcing her husband. *Id.*  She stated the angriest she had ever seen Appellant was about a week before the shooting when Appellant told her that "something had to change" and that "she was going to call her lawyer and just file for divorce." (T. at 333-334).  She testified that she visited Appellant at the jail about a week and a half after the shooting and Appellant told her "I lost it. That's it. I've lost it. I asked God to forgive me and he did." (T. at 335).  She said that Appellant seemed remorseful. *Id.*  She said she visited Appellant two or three more times and that it was during one of these visits that Appellant brought up the shooting and told her that she was putting the gun back into the sock when it accidentally went off. (T. at 337).  She said that at this time, Appellant

did not seem remorseful or upset about it, instead she seemed more relaxed. (T. at 339, 345).

{¶16} The jury also heard testimony from Andrew Chappell from the Bureau of Criminal Investigation who stated that the gun used that night was a double-action revolver, which has two trigger pulls. (T. at 299). One of the trigger pulls requires cocking the gun and another allows the gun to be fired without cocking it but required more pressure to be applied to the trigger. (T. at 300-301). He further explained that the gun was equipped with a safety hammer that prevents the gun from firing unless the trigger is being pulled and held in the pulled position. (T. at 320).

{¶17} After deliberations, the jury returned a verdict of guilty on the attempted murder charge and firearm specification. (T. at 761).

{¶18} On April 24, 2013, after a presentence investigation was completed, the trial court sentenced Appellant to three (3) years in prison on the attempted murder charge to be served consecutively to a mandatory, three (3) year sentence on the firearm specification.

{¶19} During the sentencing hearing the trial court did not address court costs. The judgment entry, however, includes an order that "all costs of this prosecution in this case are assessed against the Defendant." April 25, 2013, Judgment Entry at 7.

{¶20} Appellant now appeals, assigning the following errors for review:

## ASSIGNMENTS OF ERROR

{¶21} "I. MARY BROWN'S CONVICTION FOR ATTEMPTED MURDER WITH A FIREARM SPECIFICATION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE IN VIOLATION OF MRS. BROWN'S RIGHT TO DUE PROCESS OF LAW UNDER THE

FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION.

{¶22} "II. THE TRIAL COURT ERRED WHEN IT FAILED TO ADDRESS THE IMPOSITION OF COURT COSTS IN OPEN COURT, BUT INCLUDED SUCH COSTS IN THE SENTENCING ENTRY."

## I.

{¶23} In her First Assignment of Error, Appellant claims her conviction was not supported by sufficient evidence. We disagree.

{¶24} An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶25} In the instant case, Appellant was convicted of attempted murder in violation of R.C. §2923.02(A) and R.C. §2903.02(B) which state the following:

{¶26} "[R.C. 2923.02(A)] No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense.

{¶27} "[R.C. 2903.02](A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy."

{¶28} Appellant's specific challenge to the sufficiency of the evidence appears to be that she was emotionally unwell at the time of the shooting and that because of her

unclear mind on that night, the State failed to prove that she had a specific intention to shoot her husband.

{¶29} Upon review, we find, though, that the record contains sufficient evidence of attempted murder. Based on the testimony of witnesses, as set forth in detail above in the recitation of the facts, the jury in this case could have reasonably concluded that Appellant purposely engaged in conduct, which, if successful, could have caused the death of Ralph Brown.

{¶30} The jury in this case heard testimony from the victim Ralph Brown, the investigating officers, the investigator from the Crime Lab, the neighbor Cheri Harris and the emergency room doctor. The detectives involved in the case testified that Appellant told them she shot her husband. During the taped police interview, Appellant admitted that she "snapped in her mind" and further said she wished she had not done it. (T. at 458). Ms. Harris said Appellant told her she "lost it" and asked God for forgiveness.

{¶31} The jury was free to accept or reject any and all of the evidence offered by Appellant and the State and assess the witness's credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence". *State v. Craig* (Mar. 23, 2000), Franklin App. No. 99AP739, citing *State v. Nivens* (May 28, 1996), Franklin App. No. 95APA09–1236 Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver,* Franklin App. No. 02AP–604, 2003–Ohio–958, at ¶ 21, citing *State v. Antill* (1964), 176 Ohio St. 61, 67, 197 N.E.2d 548.; *State v. Burke,* Franklin App. No.

02AP–1238, 2003–Ohio–2889, citing *State v. Caldwell* (1992), 79 Ohio App.3d 667, 607 N.E.2d 1096.

**{¶32}** Additionally, we note that Ohio law does not recognize the defense of "diminished capacity." *State v. Wilcox* (1982), 70 Ohio St.2d 182, 194.

**{¶33}** Viewing the evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Appellant had committed the crime of attempted murder by purposely shooting Ralph Brown in the head. We hold, therefore, that the state met its burden of production regarding each element of the crime and, accordingly, there was sufficient evidence to support Appellant's conviction.

**{¶34}** Based on the foregoing, we find Appellant's First Assignment of Error not well-taken and hereby overrule same.

**II.**

**{¶35}** In her Second Assignment of Error, Appellant argues that the trial court erred in failing to address the imposition of court costs in open court. We agree.

**{¶36}** R.C. §2947.23 provides:

**{¶37}** "(A)(1)(a) In all criminal cases * * * the judge or magistrate shall include in the sentence the costs of prosecution, including any costs under [R.C.] 2947.23, and render a judgment against the defendant for such costs. If the judge or magistrate imposes a community control sanction or other nonresidential sanction, the judge or magistrate, when imposing the sanction, shall notify the defendant of both of the following:

**{¶38}** "(i) If the defendant fails to pay that judgment or fails to timely make payments towards that judgment under a payment schedule approved by the court, the court may order the defendant to perform community service * * *.

**{¶39}** "(ii) If the court orders the defendant to perform the community service, the defendant will receive credit upon the judgment at the specified hourly credit rate per hour of community service performed, and each hour of community service performed will reduce the judgment by that amount."

**{¶40}** In the instant case, the trial court failed to address court costs at the sentencing hearing thereby depriving her of the opportunity to challenge her ability to pay. The state concedes the trial court's error in failing to mention court costs at the sentencing hearing.

**{¶41}** The Supreme Court of Ohio has held that although R.C. §2947.23(A)(1) mandates that in all criminal cases the court shall include in the sentence the costs of prosecution, it was error for the trial court to impose those costs without orally notifying the defendant at the sentencing hearing. *State v. Joseph,* 125 Ohio St.3d 76, 2010–Ohio–954, 926 N.E.2d 278, ¶ 22.

**{¶42}** The remedy for the omission is to remand the case for the limited purpose of allowing Appellant an opportunity to move the court for a waiver of the payment of those costs. *Id.* at ¶ 23.

**{¶43}** Appellant's Second Assignment of Error is sustained, and the case is remanded to the trial court for the purpose of determining if the defendant should pay court costs in this case.

**{¶44}** We hereby reverse that portion of the trial court's judgment imposing court costs, affirm the remainder of the trial court's judgment, and remand the matter to the trial court for proper imposition of court costs in accordance with R.C. 2947.23(A)(1).


By: Wise, J.

Gwin, P. J., and

Baldwin, J., concur.


JWW/d 0225