[Cite as *State v. Remillard*, 2019-Ohio-3545.]

COURT OF APPEALS
KNOX COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff - Appellee | : | Hon. Craig R. Baldwin, J. |
| | : | Hon. Earle E. Wise, J. |
| -vs- | : | |
| | : | |
| KEVIN REMILLARD | : | Case No. 18CA16 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Knox County Court of Common Pleas, Case No. 17 CR 06-0122

JUDGMENT:      Affirmed

DATE OF JUDGMENT:      August 30, 2019

APPEARANCES:

For Plaintiff-Appellee

CHARLES T. MCCONVILLE
Knox County Prosecutor
117 E. High Street, Suite 234
Mt. Vernon, Ohio 43050

For Defendant-Appellant

JOHN P. PARKER
988 E. 185th Street
Cleveland, Ohio 44119

*Baldwin, J.*

{¶1}   Kevin Remillard appeals his conviction of one count of Murder in violation of R.C. 2903.02(A), an unclassified felony with a firearm specification in violation of R.C. 2941.145 and one count of tampering with evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree.

## STATEMENT OF FACTS AND THE CASE

{¶2}   On June 10, 2017, a revolver in the possession of Appellant discharged twice and one bullet struck Nick Remillard and caused his death.  The parties presented the case to the jury arguing that the only disputed issue was whether Appellant had acted with the purpose to kill Nick Remillard.  Appellant contended that the firing of the weapon was reckless or accidental and that he had no purpose to kill Nick.  Appellee presented a note drafted by Appellant after the shooting contending that the admissions contained within it, combined with the concealment of the body in the pool and disposal of the gun, supported a conclusion that Appellant acted purposely.  The jury found that Appellant acted purposely and convicted Appellant of murder with a firearm specification and tampering with evidence.

{¶3}   In April 2015, Appellant was evicted from his home in Columbus and called his aunt, Melanie Remillard for help.  Ms. Remillard's mother had been admitted to an extended care facility, so Melanie Remillard invited Appellant to live in her vacant home.  Soon Nick Remillard, the victim and Melanie Remillard's son, moved into the home and started a dog sitting business.  Nick occupied the ground floor and Appellant primarily stayed in the upper levels of the home.  Nick was an avid video game player and

participated in multi-player games over the internet and according to his Mother his games could become quite loud and chaotic.

{¶4} Appellant befriended a neighbor, Roy Daubenspeck, and spent some time at his home. Daubenspeck hired Appellant on some construction projects and asked for his help to resolve computer issues. While they were not close friends, they did spend time together and discussed mutual interests, and Daubenspeck often provided Appellant with transportation as Appellant had no vehicle of his own.

{¶5} Daubenspeck owned a Taurus .357 caliber revolver and Appellant and he often handled the weapon when Appellant visited. Daubenspeck and Appellant discussed a lose screw in the weapon, and Appellant suggested a possible repair. The revolver was operable, but had misfired on one occasion when Daubenspeck had attempted to fire it rapidly. Appellant had never fired the weapon prior to June 10, 2017, but he did know where the weapon and ammunition was stored in Daubenspeck's home.

{¶6} On June 11, 2017, Roy Daubenspeck discovered a stack of items in his driveway that he identified as the property of Appellant. With it he discovered a note from Appellant that stated: "Nothing in world makes sense. Lack of sleep, constant pain, who knows, but I snapped. These things are yours, Kevin." The text of the note worried Daubenspeck, especially after discovering that his revolver and ammunition were missing. Daubenspeck knocked on Appellant's door, but there was no answer. He called Melanie Remillard but was unable to reach her. He then called 911 and the Knox County Sheriff's Office responded.

{¶7} Deputy Scott Baker responded to the call and Daubenspeck relayed that he had found the note and Appellant's property in the driveway. After reviewing the note,

Deputy Baker became concerned that Appellant may be suicidal, so he knocked on Appellant's door. No one responded, but the deputy noticed several dogs in the house. He knew that the home was owned by Melanie Remillard, so he contacted her for assistance with the dogs so he could search for Appellant inside the home.

{¶8} Melanie Remillard arrived and confined the dogs in the back yard. Deputy Baker and Deputy Wolfe entered the home with caution, having been advised that Appellant may be carrying Daubenspeck's revolver. They entered the home with the goal of locating Appellant and insuring that he and anyone else in the home was safe. They found the first floor in disarray but did not find any person or body. Deputy Wolfe found a note on the second floor on a table in plain view. He read the first few lines, concluded it was a suicide note and picked up the note with the hope that its contents would lead to finding Appellant.

{¶9} Deputy Baker noticed that the writing in the note was similar to the writing in the note discovered by Daubenspeck. After reading the complete note his assessment of the situation changed as the author of the note mentioned several times that he had shot Nick Remillard. Deputy Baker concluded that he may now be investigating a potential murder and suicide and reported his findings to Detective Light.

{¶10} Detective David Light responded to Detective Baker's report regarding the note and some blood stains in the home. Because the note suggested that a homicide and perhaps a suicide had occurred, the officers conducted a limited search for injured or fatally wounded persons. While no victims were found, the officers did discover blood stains and bloody footprints in the home and, at that time, Detective Light sought and received a warrant to expand his search to the home and surrounding area.

{¶11} During a later search, the body of Nick Remillard was discovered in the murky water of the swimming pool behind the home. The officers found a pool pump and cord wrapped around the body, and surmised that this was done to keep the body submerged below the surface. They also discovered a blanket in the pool and concluded that the relatively clean condition of the blanket suggested that it had been in the dirty pool water for only a short period of time. The knot in the end of the blanket, and what appeared to be blood and dog hair on the blanket lead the officers to conclude that it had been used to drag Nick's body from the home to the pool.

{¶12} During a search of the home, the deputies discovered a bullet hole in the wall and, at the end of the bullet's trajectory, bullet fragments.

{¶13} On June 13, 2017, Detective Minot conducted a search for Appellant. He recruited cadaver dogs because he was still concerned that Appellant had committed suicide and that he was looking for a body. The search was unsuccessful because Appellant had not committed suicide, but had been wandering the streets pondering his fate. He had kept the revolver, disassembled it and disposed of it in three different locations. He then contacted an attorney and surrendered himself to the Mt. Vernon Police Department where he was arrested, then charged with murder and tampering with evidence.

{¶14} The state presented testimony from several experts to connect the evidence found at the scene to Appellant and the victim. Jeff Lee, Licking County Coroner, completed an autopsy and concluded that that the cause of death was a gunshot wound to the head. The death occurred 24 to 36 hours prior to the autopsy and the weapon was two to three feet from the victim when the shot was fired. Heather Williams, an expert

from the Ohio Bureau of Criminal Investigation, examined the bullet fragments recovered from the scene and the bullet removed from Nick and concluded that they were .38 caliber and that they could be fired from a Taurus revolver, the same type of weapon owned by Roy Daubenspeck and discharged while in Appellant's possession. Samuel Troyer, DNA analyst, concluded that the blood stains in the home were comprised of the blood of Nick Remillard. Rebecca Barrett of the Bureau of Criminal Investigation compared the handwriting on the note found by Daubenspeck (Exhibit 5) and the note found by Detective Baker (Exhibit 7) to the handwriting samples submitted by Appellant and concluded that both were written by Appellant.

{¶15} Appellant testified to the events leading to the shooting. He acknowledged that he learned that his neighbor, Daubenspeck, had a revolver and that he had discussed the weapon with Daubenspeck and handled it when he visited Daubenspeck. He described chronic physical ailments, his depression, persistent suicidal thoughts and described his mood on the weekend of the shooting as particularly bleak. The drive to commit suicide was very strong that day, so he went into Daubenspeck's home and took the revolver and the ammunition, with the intent of committing suicide. He did not follow through, but walked to the local market, purchased beer and returned home.

{¶16} He drank some of the beer and was talking with Nick while Nick was playing video games. He told Nick that he had almost committed suicide earlier that day and, in response to Nick's question, stated he would have used "his" revolver. He brought Roy Daubenspeck's gun down from his room to show Nick and they purportedly handled the weapon and discussed how it looked similar to a weapon used by a fictional television character. Appellant decided to return the gun to Daubenspeck's house and as he left,

he inexplicably decided to "dry fire" the weapon into the wall.[1] The gun discharged into the wall and Appellant stated he was shocked by the report. He fumbled with the weapon and though he does not deny that it discharged a second time, his testimony does not provide a clear explanation of the second shot. During his testimony he did not expressly state that he was aware that the gun fired a second time:

> I immediately jumped, because I wasn't expecting it to go off. I went and just started fumbling with it to get the cylinder out. When it sticks we usually put our hand across the release and signal(sic) the hammer back which kind of advances it inside. The only thing I can assume is that the hammer slapped back and hit a shell, but it it would be around this (indicating) distance, maybe a little further this (indicating) way. But I was trying to get the gun after it fired back to my neighbor and put it away and pretend that I never even took it from him. I immediately went out to the porch. I had no idea Nick got hit.

**{¶17}** Appellant described how he left the home, unloaded the weapon and returned the bullets to the jar on the shelf in Daubenspeck's home. He kept the empty shells and the weapon and, until he returned to the house, he claims that he did not know that Nick had been shot. When he returned home, he found Nick bleeding profusely and responded to Nick's request for water, but claims to recall little more after Nick fell silent. He does recall living in the streets and the details of his disposal of the gun. He separated the bullets, the cylinder and the body of the pistol and put the pistol in a potato chip bag and tossed it into the Kokosing River. He put the cylinder in a black sock and "whipped

---

[1] "Dry firing" is not defined in the record, but the context of this comment suggests that Appellant was referring to pulling the trigger while the gun is not loaded.

it into the first pond at Foundation Park" and threw the bullets in the river. He had no recollection of writing the eight page note, Exhibit 7, which provided a much different version of the story.

{¶18} Exhibit 7 is the note allegedly drafted by Appellant after the shooting. The entire note was read to the jury without objection. Some significant statements include:

As for yesterday, I woke in such pain and hate that all that my head was thinking was to kill everybody that was harmed -- that has harmed me my whole life.

***

So I was just going to ride my bike somewhere and shoot myself, but I have no idea how Nick got in the way. I know I fired a round into the wall to maybe let him know to leave me alone or something, but all I remember is him keep doing or saying whatever he was saying or doing, and I shoot him. At that point my mind just wanted to kill my family in mass.

***

Other than me shooting Nick, my mind is blank and tormented.

***

My mind is in so many places with no real me inside that I just couldn't keep going anymore. I'm a fucked up mess, and I killed Nick, fuck.

***

I was just going to ride my bike somewhere and shoot myself. I was relieved with my own demise and end, the end of my constant pain and misery but something took me elsewhere, something inside that I just can't keep away.

***

He never deserved this. There is anything he could have done, I was just going to shoot myself. I kept going downstairs hoping it didn't really happen, that it was just a nightmare, but it wasn't. I killed Nick.

***

Though I really did try, I was on my way to kill myself when for whatever reason they wouldn't let me without shooting Nick.

***

How could I just shoot Nick?

***

I just knew when I woke up that I wouldn't make it, but Nick was not part of the plan. So much shouldn't have happened, just so much somehow went way wrong with this. I just was going to disappear, no one knowing what become of me, but instead I hurt Nick. He wasn't supposed to be involved in this. What the fuck happened? I am so sorry I shoot him, so fucking not what I was going to do. It was just going to be me that died, not him.

***

It really should have not happened with Nick. I was just going to kill myself.

{¶19} Appellant conceded that the handwriting in Exhibit 7 appeared to be his, but he offered no reconciliation between his testimony and the version of the facts in his note.

{¶20} Appellant's trial counsel submitted jury instructions and after review by the trial court and discussion regarding the terms and timing of the instructions, they were approved with the exception of Appellant's request for an instruction on the issue of

"accident."  The trial court declined to include it, stating that it found no evidence of an accident in the record.  Appellant's trial counsel stated: "Just could the record reflect that we did ask for an instruction on accident and the Court declined to give that instruction?" The trial court responded "so noted" and no further discussion regarding that instruction occurred.

{¶21}  The jury returned a verdict of guilty of murder and tampering with evidence and Appellant was sentenced to a prison term of fifteen years to life on count one, three years on the firearm specification as to Count one, to be served consecutive and prior to the indefinite term on count one, and thirty-six months on count two, to be served consecutive to the sentence imposed in count one.

{¶22}  Appellant filed a timely appeal and submitted nine assignments of error:

{¶23} "I.  COUNSEL WAS INEFFECTIVE UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE U.S.CONSTITUTION IN FAILING TO FILE A MOTION TO SUPPRESS DOCUMENTS SEIZED DURING A WARRANTLESS SEARCH OF APPELLANT'S BEDROOM."

{¶24} "II.  COUNSEL WAS INEFFECTIVE UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION WHEN HE FAILED TO OBJECT TO ERRONEOUS JURY INSTRUCTIONS THAT DENIED MR. REMILLARD A FAIR TRIAL."

{¶25} "III. THE TRIAL COURT SHOULD HAVE GIVEN THE REQUESTED INSTRUCTION ON ACCIDENT AND DENIED THE APPELLANT HIS RIGHT TO A FAIR TRIAL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION."

**{¶26}** "IV. THE JURY SHOULD HAVE BEEN INSTRUCTED CONCERNING ORC 2901.21(A)(1) AND (F)(2) AND COUNSEL'S FAILURE TO REQUEST SUCH INSTRUCTION IN LIGHT OF EXHIBIT 7 AND STATE'S RELIANCE ON IT WAS INEFFECTIVE ASSISTANCE UNDER STRICKLAND."

**{¶27}** "V. IT WAS PLAIN ERROR TO INSTRUCT THE JURY OR OMIT INSTRUCTIONS AS DETAILED IN ASSIGNMENTS OF ERROR 2-4.

**{¶28}** "VI. THE RECORD DOES NOT SUPPORT CONSECUTIVE SENTENCES."

**{¶29}** "VII. THE CONVICTION FOR MURDER VIOLATES THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION."

**{¶30}** "VIII. EXHIBIT 7 SHOULD HAVE BEEN EXCLUDED UNDER THE OHIO RULES OF EVIDENCE AND DETERMINED TO BE INHERENTLY UNRELIABLE UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION. ITS ADMISSION IS PLAIN ERROR AND THE PRODUCT OF INEFFECTIVE COUNSEL UNDER STRICKLAND."

**{¶31}** "IX. THE CUMULATIVE ERRORS IN THE TRIAL DENIED APPELLANT DUE PROCESS UNDER THE OHIO AND FEDERAL CONSTITUTIONS."

## ANALYSIS

**{¶32}** Appellant asserts that his trial counsel was ineffective in assignments one, two, four and eight, so we will consider those assignments out of order.

**{¶33}** A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's

essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness. *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989).

**{¶34}** In order to warrant a finding that trial counsel was ineffective, the petitioner must meet both the deficient performance and prejudice prongs of *Strickland* and *Bradley. Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 1419, 173 L.Ed.2d 251 (2009).

**{¶35}** Appellant first asserts that trial counsel was ineffective for failing to file "a motion to suppress documents seized during a warrantless search of Appellant's bedroom. "[F]ailure to file a suppression motion does not constitute per se ineffective assistance of counsel." *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). "To demonstrate ineffective assistance for failing to file a motion suppress, a defendant must show: (1) a basis for the motion to suppress; (2) that the motion had a reasonable probability of success; and (3) a reasonable probability that suppression of the challenged evidence would have changed the outcome at trial." *State v. Clark,* 6th Dist. Williams No. WM-09-009, 2010-Ohio-2383, ¶ 21. An ineffective assistance of counsel claim will be rejected when counsel's failure to file a suppression motion "was a tactical decision, there was no reasonable probability of success, or there was no prejudice," or where counsel could have reasonably decided that filing such a motion would have been futile, even if there is evidence in the record to support such a motion. *State v. White*, 4th Dist. Washington Nos. 17CA10& 17CA11, 2018-Ohio-18, ¶ 39, citing *State v. Nields*, 93 Ohio St.3d 6, 2001-Ohio-1291, 752 N.E.2d 859. *State v. Phelps*, 5th Dist. Delaware No. 18 CAA 02 0016, 2018-Ohio-4738, ¶ 13.

**{¶36}** We first consider whether the officer's entry in the home was permitted. The Deputies reasonably suspected Appellant may have committed or would attempt to commit suicide based upon the information provided by Mr. Daubenspeck, and relied upon this concern to force entry into the home. "Breaking into a home by force is not illegal if it is reasonable in the circumstances. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent exigency or emergency." *State v. Burgess* (Nov. 4, 1999), 5th Dist. No. 99–CA–0035, quoting W*ayne v. United States,* 318 F.2d 205, 212 (D.C.Cir.1963). "The question becomes whether the State's interest in sweeping a residence upon responding to a dispatch for possible suicide and possible weapons is sufficient to warrant this intrusion and whether the search policy in question is "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**{¶37}** We find that the instant search was justified when tested by both criteria from *Terry.* The government has a legitimate interest in conducting a search of a residence when they are called to that residence as a result of the receiving reliable evidence that the Appellant may be suicidal and has access to weapons, and that such an interest is more than sufficient to justify this search. *State v. Bethel*, 5th Dist. Tuscarawas No. 10-AP-35, 2011-Ohio-3020, ¶21. While suicide is not a crime, police officers have a duty to prevent citizens from harming themselves and were performing this duty when they entered appellant's home. Based on the deputies' testimony, we conclude that the exigent circumstances were sufficient to justify the entry into appellant's home. *State v. Neptune*, 4th Dist. Athens No. 99CA25, 2000 WL 502830, *5.

**{¶38}** While the warrantless entry into the home was justified, Appellant argues that the warrantless seizure of Exhibit 7 impermissibly extended what should have been a limited search for Appellant and that trial counsel was ineffective for failing to present that argument. The deputies were looking for Appellant, Appellant's body or any evidence that could lead to discovering Appellant's location.  Deputy Baker saw the note, in plain view, on a table in the upstairs bedroom.  He read a few lines, concluded it was a suicide note and took the note to Deputy Wolf.  Deputy Wolf reviewed entire note for evidence that might lead to the discovery of Appellant, his plans or whereabouts. Once they read the entire note, the deputies realized that they may be investigating a homicide as well as a suicide.

**{¶39}** The deputies did not know in advance the location of incriminating evidence and intend to seize it, relying on the plain view doctrine only as a pretense. *Coolidge v. New Hampshire*, 403 U.S. 443, 469–71, 91 S.Ct. 2022, 2040, 29 L.Ed.2d 564 (1971). The discovery of the incriminating content of the note was the inadvertent result of responding to the exigent circumstances, the threat that the Appellant had committed suicide. *Id.* The plain view exception to the warrant requirement was satisfied in this case because the initial intrusion and review of the content of Exhibit 7 was supported by exigent circumstances, the incriminating evidence in Exhibit 7 was inadvertently discovered, it was immediately apparent that Exhibit 7 was evidence of a crime and the totality of the circumstances supported a conclusion that there was probable cause to justify the seizure.  *State v. Mowbray*, 72 Ohio App.3d 243, 247, 594 N.E.2d 626 (4th Dist.1991).

**{¶40}** We hold that the facts do not support Appellant's contention that trial counsel was ineffective for failing to file a motion to suppress documents removed from the residence because it is not probable that such a motion would have succeeded and it would have been reasonable for counsel to decide, as a matter of trial strategy, that pursuing such a motion would have been futile.

**{¶41}** Appellant's first assignment of error is overruled.

**{¶42}** Appellant argues in his second assignment of error that trial counsel was ineffective for failing to object to an erroneous jury instructions and that failure ultimately denied him a fair trial. Appellant contends that the errors involve the introduction to the issue of lesser included offenses and an error in the definition of murder.

**{¶43}** With regard to the issue of lesser included offenses, Appellant argues that trial counsel was obligated to object to the use of the following instruction:

> However, if you find that the state has failed to prove beyond a reasonable doubt all the essential elements of murder, then your verdict must be not guilty of the murder charge, and in that event you will continue your deliberations to decide whether the state has proven beyond a reasonable doubt all the essential elements of one of the lesser included offenses which I'm going to define for you.

**{¶44}** Appellant contends that the first clause of this instruction should read "If you find that the state failed to prove beyond a reasonable doubt **any** of the essential elements of the offense of murder ***" (emphasis added.). The only difference between the two instructions is the use of the word "all" in the instruction read by the trial court in place of the word "any." Appellant contends that the alteration of that one word misled the jury to

believe that if the state proved any element beyond a reasonable doubt, they could not consider a lesser included offense.   We find that Appellant's interpretation of the instruction strained and untenable because there is no practical difference between the state failing to prove any element and the state failing to prove all elements of murder. While the terms are different, the instructions impose the same burden on the state and convey the same message to the jury—if the state failed to convince the jury of each element of the charge of murder beyond a reasonable doubt, the jury may consider a lesser included offense.

{¶45}  The paragraph that immediately follows the offending instruction reinforces its meaning:

> Similarly, if all of you are unable to agree on a verdict of either guilty or not guilty of the murder charge, then you will continue your deliberations to decide whether the state has proven beyond a reasonable doubt all of the essential elements of the one of the lesser included offenses which I will now define for you.

{¶46}  We hold that this instruction was not erroneous and trial counsel was not ineffective for not objecting to its use.

{¶47}  Appellant next contends that trial counsel was ineffective for failing to object to an erroneous definition of murder read into the record by the trial court when it instructed the jury.  The trial court did include a reference to "purpose to inflict bodily harm" that is not a part of the definition of murder within jury instructions.  This error occurred only at one location in the record of the trial court's reading of the instructions. The record does not contain a copy of the instructions that were given to the jury to read

along with the judge's narration or reveal whether the instructions were taken by the jury into the jury room. The relevant charge as read to the jury states:

> If after considering all of the evidence you're convinced beyond a reasonable doubt that the defendant had a purpose to kill **or inflict bodily harm** on Nickolas Remillard, you must return a verdict of guilty on the murder charge. If after considering all of the evidence you are not convinced beyond a reasonable doubt that the defendant acted either purposely, recklessly or negligently in causing the death of Nickolas Remillard, you must return a verdict of not guilty on the murder charge and both of the lesser included offenses as well as the firearm specification. (Emphasis added.)

**{¶48}** The inclusion of a reference to "bodily harm" is incorrect as that phrase does not appear in the definition of murder. We review this issue by considering whether this single error prejudiced Appellant.

**{¶49}** The general rule is that an erroneous instruction does not necessarily mislead a jury. *Cleveland Elec. Illum. Co. v. Astorhurst Land Co.,* 18 Ohio St.3d 268, 274–275, 480 N.E.2d 794 (1985).

> **{¶50}** "Reversible error ordinarily cannot be predicated upon one paragraph, one sentence or one phrase of the general charge. As this court held, in paragraph six of the syllabus of *Flynn v. Sharon Steel Corp.* 142 Ohio St. 145, 50 N.E.2d 319 (1943):
>
> 'Where complaint is made as to a portion of the charge of the court, a reviewing court will consider all of the charge upon the particular subject

complained of to determine whether prejudicial error has been committed against the party complaining.'

**{¶51}** If the general charge, considered as a whole, is not prejudicial to the objecting party, no reversible error results from a misstatement or ambiguity in a portion thereof. In paragraph eight of the syllabus in *Centrello v. Basky*, 164 Ohio St. 41, 128 N.E.2d 80 (1955), this court said:

'Even though a paragraph in a general charge taken by itself is improper and misleading, yet where considered in connection with the whole charge and the entire instruction of the court to the jury, it is apparent that no prejudicial error resulted, the judgment rendered on a verdict will not be reversed for such error.'

*State v. Porter,* 14 Ohio St.2d 10, 13, 235 N.E.2d 520 (1968) (Citations omitted.).

**{¶52}** To conclude that a party's substantial rights were materially affected, an appellate court must find that the jury charge was so misleading and prejudicial as to result in an erroneous verdict. *Cleveland Elec. Illum. Co. v. Astorhurst Land Co.*, *supra.* Making such a determination requires a "thorough review of the entire transcript of proceedings before the trial court." *Hampel v. Food Ingredients Specialties, Inc.,* 89 Ohio St.3d 169,186, 2000-Ohio-128, 729 N.E.2d 726.

**{¶53}** After a thorough review of the transcript in the case at bar, we find that focus of both Appellee and Appellant in this case was the mens rea of Appellant. The records contains uncontradicted evidence that Appellant was in physical possession of the revolver that discharged twice, one bullet punctured the wall, one bullet entered the victim's head, lodged in his arm and caused his death. The victim's body was dragged

from the home and concealed in the murky water of the swimming pool. During closing argument defense counsel conceded that Appellant shot the victim and that he did "cause Nick's death." Appellant's trial counsel selected the strategy of attacking the only issue that could be challenged:

> "And the only question becomes what was the intent. Was it intent to kill. Was it negligence. Was it recklessness. Those are the only questions at that point."

> "And that is what we ask you to do, folks, to listen and analyze what Kevin said and the context of his state of mind of what he was doing, what was going through his head and his body on that Saturday."

{¶54} Our review of the potential prejudice caused by the instruction must be considered in the context of the argument that the sole issue to be determined was the mens rea of Appellant.

{¶55} The reference to bodily harm appears only once in the record; otherwise the definition of murder and the relevant burden of proof is described correctly in the instructions and clearly stated that "purpose to cause death is an essential element of the crime of murder." The instructions for the lesser included offenses of reckless homicide and negligent homicide referenced causing the death of Nickolas Remillard with the pertinent distinction being the mental state of the Appellant. We are not convinced that the inclusion of the reference to physical harm was so misleading and prejudicial as to result in an erroneous verdict, but that is not the question we are addressing. We need only consider whether trial counsel was ineffective for failing to object to the instruction. Considering the weight of the evidence against Appellant, and trial counsel's strategy to

attack the issue of mens rea, we find that trial counsel could reasonably conclude that objecting to this instruction would distract from his argument. "The Ohio Supreme Court has stated "[w]e will ordinarily refrain from second-guessing strategic decisions counsel make at trial, even where counsel's trial strategy was questionable. *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980)." *State v. Myers*, 97 Ohio St.3d 335, 362, 2002-Ohio-6658, 780 N.E.2d 186 (2002) as quoted in *State v. Elmore,* 5th Dist. Licking No. 2005-CA-32, 2005-Ohio-5940, ¶ 133. We will not second-guess the strategic decisions counsel made at trial even though appellate counsel now argue that they would have defended differently." *State v. Post*, 32 Ohio St.3d 380, 388, 513 N.E.2d 754 (1987) as cited in *State v. Mason,* 82 Ohio St.3d 144, 169, 1998-Ohio-370, 694 N.E.2d 932.

**{¶56}** Appellant's second assignment of error is overruled.

**{¶57}** In Appellant's fourth assignment of error, he contends his trial counsel was ineffective for failing to request a jury instruction regarding R.C. 2901.21(A)(1) and (F)(2) in light of the state's reliance on Exhibit 7. Without clearly stating it, Appellant is arguing that he was entitled to an instruction regarding his diminished capacity to act within the law at the time of the shooting. For the reasons set out below, we must reject this argument.

**{¶58}** Exhibit 7 is the eight page note drafted by appellant and found by the investigating officers in appellant's bedroom. The text, described above, was presented by the state as an admission of guilt. Appellant is now contending that the text of the note demonstrates that mental illness may have diminished appellant's capacity to act and that therefore an instruction based upon the relevant portions of R.C. 2901.21 was necessary and trial counsel was ineffective for failing to request it.

**{¶59}** Revised Code Section 2901.21(A) states in relevant part that "(A) Except as provided in division (B) of this section, a person is not guilty of an offense unless both of the following apply *** The person's liability is based on conduct that includes either a voluntary act, or an omission to perform an act or duty that the person is capable of performing *** [and] [t]he person has the requisite degree of culpability for each element as to which a culpable mental state is specified by the language defining the offense." Subsection F(2) states: "Reflexes, convulsions, body movements during unconsciousness or sleep, and body movements that are not otherwise a product of the actor's volition, are involuntary acts."

**{¶60}** Appellant questions whether "the shooting was done by Remillard's own volition? Or did the demons and those in his head overcome his own volition?" Appellant is arguing that the facts support an argument that he was not in control of his actions during the shooting, but as we found when a defendant claimed she "snapped in her mind" and "lost it" when she shot her husband, "Ohio law does not recognize the defense of "diminished capacity." *State v. Wilcox*, 70 Ohio St.2d 182, 194, 436 N.E.2d 523 (1982) as quoted in *State v. Brown*, 5th Dist. Tuscarawas No. 2013 AP 05 0021, 2014-Ohio-888, ¶ 32. As the defense of diminished capacity is not valid, trial counsel cannot be found ineffective for failure to raise it. *State v. Mitchell*, 53 Ohio App.3d 117, 119, 559 N.E.2d 1370 (8th Dist.1988), *cause dismissed,* 38 Ohio St.3d 715, 533 N.E.2d 784 (1988) as quoted in *State v. Hanley*, 8th Dist. Cuyahoga No. 67235, 1995 WL 229106, *2.

**{¶61}** Appellant's fourth assignment of error is overruled.

**{¶62}** In Appellant's eighth assignment of error, Appellant claims Exhibit 7 should have been excluded under the Ohio Rules of Evidence because it was inherently

unreliable and its admission was plain error and the product of ineffective assistance of counsel.   Appellant's argument is based upon his counsel's contention that he was mentally ill, unstable and had demons controlling his actions.

**{¶63}** Appellant is essentially repeating his diminished capacity argument and suggesting that trial counsel was ineffective for not pursuing that defense with the goal of excluding Exhibit 7.  As noted above, the defense of diminished capacity is not recognized in Ohio and we cannot fault for not pursuing a futile act.  Further, the record contains no evidence that the Appellant was unable to form the requisite mental state at the time of the shooting or that he was incompetent in any way.  Trial counsel may have reasonably determined that pursuing an insanity defense in lieu of arguing the lack of appropriate mens rea, was not in his client's best interest and we will not interfere with counsel's reasonable approach.

**{¶64}** Appellant's eighth assignment of error is overruled.

**{¶65}** In Appellant's third assignment of error, he contends that the trial court erred by failing to include an instruction for "accident" as requested.  While Appellant did submit an instruction for accident, it was rejected by the trial court as not supported by the record. Appellant's trial counsel stated: "Just could the record reflect that we did ask for an instruction on accident and the Court declined to give that instruction?"  The trial court responded "so noted" and no further discussion regarding that instruction occurred.

**{¶66}** Criminal Rule 30(A) states in relevant part that "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." As we found in *State v. Rohaley,* 5th Dist. Stark No.

1998CA00092, 1999 WL 4505, *7, counsel did not fully comply with Crim.R. 30(A) by stating the specificity of the nature of his request, or the grounds for the request. Therefore, we must find plain error to reverse."

**{¶67}** We apply the doctrine of plain error cautiously and only under exceptional circumstances to prevent a manifest miscarriage of justice. *Id.* In that regard, "[T]he test for plain error is stringent." *State v. Ellison*, 4th Dist. No. 16CA16, 2017-Ohio-284, 81 N.E.3d 853, ¶27. "To prevail under this standard, the defendant must establish that an error occurred, it was obvious, and it affected his or her substantial rights." *State v. Spaulding,* 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 64. An error affects substantial rights only if it changes the outcome of the trial. *Id.* As noted we notice plain error only to prevent a manifest miscarriage of justice. *State v. Fouts,* 4th Dist. Washington No. 15CA25, 2016-Ohio-1104, 2016 WL 1071457, ¶ 59, quoting *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. The defendant carries the burden to establish the existence of plain error, unlike the situation in a claim of harmless error, where the burden lies with the state.

**{¶68}** In the case at bar we cannot find plain error. The general instructions clearly instructed jurors that the required mens rea was "purposeful" conduct that went beyond conduct considered to be an accident. If the jury believed defendant's accident defense, it would have been required to find him not guilty in accord with the instructions given. *State v. Smiley,* 8th Dist. Cuyahoga No. 03853, 2010-Ohio-4349. We also note that Appellant's trial counsel freely referred to the shooting as accidental or an accident. We do not find that the outcome of the trial would have been different or that there has been a manifest miscarriage of justice by the omission of the accident instruction.

**{¶69}** Appellant's third assignment of error is overruled.

**{¶70}** Appellant argues, in his fifth assignment of error that it was plain error to instruct the jury or omit instructions referenced in assignments of error two and four. While our analysis of those assignments focused upon whether trial counsel was ineffective, the analysis is used to determine whether the trial court committed plain error by including or failing to include the respective jury instructions. The Supreme Court of Ohio, addressing review of plain error "clarified in *State v. Rogers,* 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, that the accused is "required to demonstrate a reasonable probability that the error resulted in prejudice – the same deferential standard for reviewing ineffective assistance of counsel claims." (Emphasis sic.) *Id.* At ¶ 22, citing *United States v. Dominguez Benitez*, 542 U.S. 74, 81-83, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) as quoted in *State v. Helfrich*, 5th Dist. Licking No. 18-CA-45, 2019-Ohio-1785, ¶ 88. The Appellant must demonstrate prejudicial error by the trial court that affected the outcome of the trial. Even "If the accused shows that the trial court committed plain error affecting the outcome of the proceeding, an appellate court is not required to correct it; we have "admonish[ed] courts to notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " (Emphasis added.)  *State v. Barnes,* 94 Ohio St.3d 21, 27 2002-Ohio-68, 759 N.E.2d 1240, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. *State v. Thomas,* 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, reconsideration denied, 151 Ohio St.3d 1445, 2017-Ohio-8730, 87 N.E.3d 215.

**{¶71}** Because the Appellant is "required to demonstrate a reasonable *probability* that the error resulted in prejudice – the same deferential standard for reviewing

ineffective assistance of counsel claims" (Emphasis sic.)  *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22 quoting *United States v. Dominguez Benitez, supra* at 81-83 and because we have overruled the argument that trial counsel was ineffective, we are constrained by precedent and our analysis to arrive at the same conclusion when the assignment is recast as a plain error.  We find that there was no manifest miscarriage of justice and insufficient evidence that the outcome of the trial was affected by the issues described in assignments of error two and four.

**{¶72}** Appellant's fifth assignment of error is overruled.

**{¶73}** Appellant's sixth assignment of error attacks the imposition of consecutive sentences arguing that the sentence imposed for murder, with the weapon specification, undermined the rational for consecutive sentencing.   Appellant also argues the Appellant's criminal history is a factor that supports concurrent rather than consecutive sentencing.

**{¶74}** Revised Code Section 2929.14(C)(4) controls the trial court's discretion to impose consecutive sentences:

(4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶75}** During sentencing the trial court expressly considered the terms of R.C. 2929.14(C)(4) and first determined that consecutive sentences were necessary to protect the public from future crime, specifically referencing the families expressed concern for their safety. Several family members were present and offered statements at the sentencing. The trial court received their concerns about safety, took them seriously, and considered them legitimate.

**{¶76}** The trial court also determined that consecutive sentences were warranted as punishment and were not disproportionate to the offender's conduct. The trial court concluded by finding that "that at least two of the multiple offenses were committed as part of one or more courses of conduct and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the

offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct."

**{¶77}** The transcript of the sentencing hearing and judgment entry clearly indicate the trial court engaged in the appropriate analysis and made the required findings under R.C. 2929.14(C)(4). Rather than establishing error, the record supports the trial court's findings for imposing consecutive sentences.

**{¶78}** Appellant's sixth assignment of error is overruled.

**{¶79}** Appellant contends in his seventh assignment of error that the conviction for murder violates the Fourteenth Amendment of the U. S. Constitution, and repeats his argument regarding diminished capacity in support of an argument that the trial court inappropriately allowed the jury to consider Exhibit 7 because Appellant was mentally ill making that document inherently unreliable.

**{¶80}** This argument was not presented to the trial court and we will not consider it on appeal, since failure to object at trial generally waives any alleged error on appeal. *State v. Watson*, 61 Ohio St.3d 1, 6, 572 N.E.2d 97 (1991). While we have the discretion to consider this assignment as plain error, (Crim.R.52), Appellant does not present a plain error argument and we are not inclined to create one, particularly because we have addressed the admission of Exhibit 7 under prior assignments and no novel argument is contained within this assignment. *State v. Hairston*, 9th Dist. Lorain No. 05CA008768, 2006-Ohio-4925, ¶ 11.

**{¶81}** Appellant's seventh assignment of error is overruled.

**{¶82}** Appellant contends that cumulative errors in the trial denied appellant Due Process under the Ohio and U.S. Constitutions in his ninth assignment of error and argues

that "[i]n this case, there were numerous errors especially as it concerns the jury instructions and State's Exhibit 7. The cumulative effect of the errors discussed in detail above require a new trial." appellant cites the doctrine of cumulative error, references the previous assignments of error, but gives no analysis or explanation as to why or how the errors have had a prejudicial cumulative effect.  It is simply not enough to intone the phrase "cumulative error." *State v. Sapp,* 105 Ohio St.3d 104, 822 N.E.2d 1239, 2004-Ohio-7008, ¶ 103 as quoted in *State v. Allen,* 5th Dist. Delaware No. 2009-CA-13, 2010-Ohio-4644, ¶ 254.

**{¶83}** Where we have found that the trial court did not err, cumulative error is simply inapplicable. *State v. Carter,* Stark App. No.2002CA00125, 2003-Ohio-1313 at ¶ 37. To the extent that we have found in this case that claimed error did not rise to the level of plain error, we conclude that the cumulative effect of such claimed errors is also harmless because taken together, they did not materially affect the verdict. *State v. Leonard,* 104 Ohio St.3d 54, 818 N.E.2d 229, 2004-Ohio-6235 at ¶ 185.

**{¶84}** In addition, a cumulative-error analysis aggregates only actual errors to determine their cumulative effect. Individual rulings frequently will have an adverse effect on a party, but unless that party can demonstrate that the ruling was an error, reversal would not be warranted. Impact alone, not traceable to error, cannot form the basis for reversal. The same principles apply to a cumulative-error analysis, and we therefore hold that a cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors. *State v. Allen*, 5th Dist. Delaware No. 2009-CA-13, 2010-Ohio-4644, ¶ 257.  As we have not found multiple instances of error,

and because Appellant has failed to provide any analysis in his claim, his ninth assignment of error is overruled.

**{¶85}** The decision of the Knox County Court of Common Pleas is affirmed.

By: Baldwin, J.

Hoffman, P.J. concurs separately.

Wise, Earle, J. concurs separately.

*Hoffman, P.J., concurring*

{¶86} I concur in the majority's analysis and disposition of Appellant's first assignment of error and that portion of Appellant's second assignment of error relating to the issue concerning lesser included offenses.

{¶87} I further concur in the majority's disposition of Appellant's second assignment of error regarding the incorrect instruction referencing "bodily harm" in the murder instruction. However, I would not find it was a strategic trial strategy, but would overrule it as not prejudicial under prong two of the *Strickland* test.

{¶88} I also concur in the majority's analysis and disposition of Appellant's fourth, fifth (with the qualifications noted in my concurrence to the majority's analysis of Appellant's third assignment of error, infra), sixth, seventh, eighth and ninth assignments of error.

{¶89} In reviewing Appellant's third assignment of error challenging the trial court's failure to include a jury instruction on "accident", the majority applies a "plain error" analysis. I disagree. As noted in the majority opinion, Appellant submitted an instruction for accident which was rejected by the trial court. The trial court noted on the record Appellant's trial counsel's request for an accident instruction was declined. As such, I find analysis under a "plain error" standard of review inappropriate.

**{¶90}** I find the Appellant's explanation of the shooting of the gun set forth in paragraph no. 16 of the majority opinion, when considered in a light most favorable to him, sufficient to warrant giving an accident instruction. I find it was error not to do so. However, I find considering the weight of the evidence taken as a whole renders the error harmless. Accordingly, I concur in the majority's decision to overrule this assignment of error.

*Wise, Earle, J., concurring*

{¶91} I concur in the opinion of Judge Baldwin with the exception of assignment of error number three. While I agree in overruling the assignment, I get there by a slightly different path.

{¶92} As to assignment of error number three, I first note that I concur with Judge Hoffman and find the request for and the denial of an instruction on accident was preserved in the record. Therefore, the consideration of this assignment is not one based upon plain error.

{¶93} I find no error by the trial court in refusing to instruct on accident. The record contains acts of volition by appellant that do not support accident. As indicated in paragraphs eleven, seventeen and eighteen of the opinion, the body was dragged from the place of the fatal shot to a swimming pool. It was weighted down and hidden in the murky opaque water. The weapon was disassembled and the pieces thrown separately into three locations including a pond and a river.

{¶94} In the note Appellant wrote the day after the shooting, Exhibit 7, he gave no indication that the shooting was an accident. To the contrary, throughout the note he claimed that voices in his head overrode his ability to resist shooting Nick. These voices continued to speak to him and he was afraid that he would give into their demands to kill others. The following passage is one example:

My head is full of other people, always has been and they all think their (sic)

the actual owner of me. Yesturday (sic) they or one of them took over and

all I could do was watch. I tried very hard to not let them but something

finnaly (sic) snapped inside and poor Nick was victimized by it. I have to destroy myself because they still want to kill more people.

While this may support some other type of defense, it clearly shows the shooting was not accidental.

**{¶95}** Appellant testified during the trial as set out in paragraph sixteen of the opinion. He claimed he was surprised the gun fired when he pulled the trigger and then fumbled with the gun and was unaware it fired a second time. He said he did not immediately know that the victim had been shot.

**{¶96}** Based upon the state of the evidence before the trial judge, I do not find an abuse of discretion in the refusal to instruct on accident and find no error. I would overrule assignment of error number three on that basis.